STATE OF NORTH CAROLINA v. THEODORE MORRIS FOUST

No. 624A83

(Filed 6 July 1984)

1. **Criminal Law § 50.1 — expert testimony — percentage of synthetic fibers which are rayon — admission of testimony as harmless error**

   In a prosecution for a sexual offense in which an expert in fiber analysis and identification testified that fibers from defendant's bedspread and from the victim's clothing contained rayon, the admission of testimony by the expert that, based on 1979 statistics, less than six and one-half percent of all man-made textile fibers produced in the United States have rayon in them, if erroneous, was not prejudicial where the witness had previously testified without objection that "based upon my experience, the use of polyester is quite common, but the use of rayon is becoming more and more less common"; the overall implication of the expert's testimony was that the fibers from the clothing came from a bedspread using the same materials; and there was other overwhelming evidence of defendant's guilt.

2. **Criminal Law § 102.8 — jury argument that State's evidence was uncontroverted or uncontradicted — no comment on failure of defendant to testify**

   The prosecutor did not improperly comment on defendant's failure to testify when he made repeated references to the fact that the evidence presented by the State was "uncontroverted" or "uncontradicted" where much of the State's evidence was theoretically contradictable by testimony of persons other than defendant, and the prosecutor's argument was directed at defendant's failure to offer evidence to rebut the State's case. Furthermore, any prejudice from the remarks was removed by the trial court's instructions on defendant's right not to testify.

3. **Criminal Law § 126; Rape and Allied Offenses § 6 — sexual offense — instruction in disjunctive — no denial of unanimous verdict**

   A defendant convicted of a first-degree sexual offense was not denied his right to a unanimous verdict by the trial court's instruction that the jury should return a verdict of guilty if they found beyond a reasonable doubt, *inter alia*, that defendant engaged in "oral sex or anal sex with the victim" where the trial court's other instructions obviously required a verdict of not guilty if all twelve jurors were not satisfied beyond a reasonable doubt that defendant participated in either fellatio or anal intercourse, or both, with the victim, and the evidence amply sustained a conviction for either or both of those offenses. However, it is the better practice that trial judges in cases involving first or second-degree sexual offenses submit separate issues of each unlawful sexual act if more than one act exists.

ON appeal by defendant as a matter of right from the judgment of *Long, Judge,* entered at the 5 August 1983 Criminal Session of GUILFORD County Superior Court, imposing a life sentence

for first-degree sexual offense and twenty-five years for first-degree kidnapping, with the sentences to run consecutively. We allowed defendant's motion to bypass the North Carolina Court of Appeals on the kidnapping conviction.

In relevant part, the evidence for the State tended to show that on 3 July 1982, an eighteen year old named John lived with his mother in Elon College, North Carolina. In the early hours of the morning, John, his mother and his grandparents drove to the Farmer's Curb Market in Greensboro to sell their produce. When they arrived at the Farmer's Market, John helped his mother and grandparents unload their truck.

After unloading the truck, John walked a couple of blocks to buy a soda from a drink machine. As he was returning, a black male, approximately six feet tall, wearing shorts and a tank top, walked passed John, grabbed him around the neck and stuck a gun in his back. John was ordered at gunpoint to a brick two-story house located next to a loan company in the 500 block of Summit Avenue and forced to enter the unlocked back door. Once inside, they climbed the stairs, turned left and walked down a long hall to a padlocked door with the number "7" on it. The man unlocked the door and ordered John inside.

John first observed a small narrow hallway containing a refrigerator, stove, two bicycles and a bathroom. The apartment was a one room apartment. The bed was across the room from the hallway. Next to the bed was a coffee table with a digital clock and a black light lamp on it.

At this point the assailant ordered John onto the bed. John turned around and for the first time observed the man, whom he later identified as the defendant. He ordered John to undress. John replied that he did not want to undress, but the man threatened to kill him unless he obeyed. The man inquired as to John's name and then stated that his name was "Ted."

After John removed his clothes he was forced to lie on his stomach. His hands were tied behind his back and the gun was placed on the coffee table adjacent to the bed. John later described it as a .45 caliber pistol.

Using cream as a lubricant, the defendant performed anal intercourse on John for a period of five to ten minutes. After this

assault, the sodomist ordered John to perform fellatio on him. When John refused, the man, who in the meantime had picked up the pistol, told him that he would kill him if he did not comply. Defendant cocked the pistol and began to count to three. John succumbed and began to perform. Then the assailant performed fellatio on the frightened victim. When this assault was completed John was untied and told to get dressed.

As John dressed, the defendant told him, "You don't know me, you don't know what I look like and you don't know where I live." Under the circumstances, John agreed. John was then led at gunpoint out of the apartment, down the front stairs and out the front door. Once outside, the defendant asked John if he wanted any liquor or drugs. John refused and was allowed to leave. He ran back to the Farmer's Market where his mother and grandparents were waiting.

After informing his mother of the assault, she drove him to the police station. There John related to Officer Simmons what had occurred and directed her to the defendant's apartment. He later described the assault in detail to Officer Ingold, who escorted him to the hospital. At the hospital John was examined and a rape kit was prepared.

The swabs and smears in the rape kit were later examined by F.B.I. Agent McInnis, a serologist. Agent McInnis testified that he examined two anal smears taken from the victim. On one of the slides he found evidence of semen. He found no semen on the other slide and no semen on either of the anal swabs.

The victim was examined by Dr. Nelson and interviewed by Officers Ingold and Lee. John gave the officers a complete statement of the incident which was substantially consistent with his trial testimony. John also gave the officers a description of the inside of the apartment and of the clothes the defendant was wearing. He was then taken to the police station where he was shown a photo-array. John identified the defendant's picture as the perpetrator of the crimes. Shortly thereafter, the defendant was arrested and taken to the police department.

Defendant was questioned, after being advised of his rights and a waiver of rights was obtained. He denied knowing anything about the assault. He stated that no one had been in his apart-

ment that night or morning. The defendant consented to a search of his apartment and accompanied the officers to Apartment #7.

The defendant opened the apartment door for the officers. Photographs of the apartment were taken and other evidence collected. Inside the apartment, Officer Michaels seized a white rag, a pair of black gym shorts inscribed with the name "Greensboro Public Schools" and a blue mesh tank top. A Vaseline jar was found on the floor between the bed and the coffee table. The lamp on the table near the bed contained a black light bulb. The police also seized a brown bedspread from the unmade bed as well as a Marksman Repeater pistol with a slide action top mounted on a .45 caliber frame which was found in a travel bag.

The bedspread seized from the defendant's apartment was sent to the F.B.I. laboratory for fiber analysis. Agent Chester Blythe testified that he examined the victim's belt, blue jeans, shirt and underwear and found brown fibers on them. After comparing these brown fibers and the bedspread fibers, Agent Blythe determined that the dyes in the fibers were identical and that both were composed of polyester and rayon fabrics. Over the defendant's objection, Agent Blythe was permitted to testify that based on some 1979 statistics, less than six and one-half percent of all man-made textile fibers produced in the United States have rayon in them. Based on the microscopic analysis that he conducted on the fibers from the bedspread and fibers found on the victim's clothes, it was Agent Blythe's opinion that the fibers on the victim's clothes could have originated from the defendant's bedspread.

Defendant offered no evidence. Judge Long instructed the jury on first-degree sexual offense and first-degree kidnapping. No lesser included offenses were submitted to the jury. The jury found the defendant guilty of both offenses and the defendant was sentenced to life imprisonment for first-degree sexual offense and a consecutive term of twenty-five years for first-degree kidnapping.

Additional facts, which become relevant to defendant's specific assignments of error, shall be incorporated into the opinion.

*Attorney General Rufus L. Edmisten by Special Deputy Attorney General Isham B. Hudson, Jr., for the State.*

*Assistant Appellate Defender Ann B. Petersen, for the defendant.*

COPELAND, Justice.

Defendant brings forward three assignments of error which he contends require a new trial. We disagree and affirm the sentences imposed.

[1] Under the first assignment, the defendant contends that the court erred in permitting the State to introduce evidence concerning the percentage of rayon fibers produced in the United States, on the grounds that such evidence was inadmissible hearsay as well as irrelevant.

As part of its case in chief, the State presented testimony from F.B.I. Special Agent Blythe, who had been qualified as an expert in the field of hair and fiber analysis and identification. As stated earlier the Agent opined that the fibers found on the victim's clothes could have originated from the defendant's bedspread. Defense counsel objected to the following testimony elicited by the prosecutor on direct examination:

Q. Have you done any comparison, checking in light of your duties and responsibilities as a fiber analyst into the amount of use of rayon in fabrics?

A. Yes, sir, I have.

Q. And do you have an opinion based on your research and investigation into this matter as to how commonplace the use of rayon fabric is in the textile industry?

MR. HARRELSON: Objection.

THE COURT: On grounds of expertise?

MR. HARRELSON: Yes. He said he did some checking, but he hasn't shown what extent it was done.

MR. COMAN: Does he want to ask him about the research?

MR. HARRELSON: I don't want to ask him about anything. I think the burden is on you.

THE COURT: Well, the objection is overruled. The Court holds he is in a better position than the jurors to form such an opinion.

BY MR. COMAN:

Q. Go ahead, Agent Blythe.

A. I did some checking of data that we have in the FBI Laboratory concerning the use of both polyester and rayon fibers as are in relation to the production of these synthetic fibers in the United States.

Q. All right. What would that percentage be?

MR. HARRELSON: Objection.

THE COURT: Overruled.

You may answer, if you know.

THE WITNESS: Based on the latest information which I could find—This is 1979 statistics—Rayon comprised slightly less than six and a half percent of all the man-made textile fibers produced in the United States.

The defendant argues that the challenged testimony misled the jury by giving them the impression that since rayon is seldom used, the fact that the fibers from the bedspread and from the victim's clothes contained rayon was highly significant to the defendant's guilt. Defendant reasons that the State wanted to show that while the tests performed by Agent Blythe were inconclusive, there was a high probability that the fibers found on the victim's clothing did in fact originate from the bedspread. The defendant concludes that the State accomplished its goal when the agent was permitted to testify with regard to the actual percentage of rayon in American made textile fibers.

The record discloses that prior to the objected testimony being offered, Agent Blythe testified, without objection, that "[b]ased upon my experience, the use of polyester is quite common, but the use of rayon is becoming more and more less common." Further, the overall implication gathered from the agent's testimony was that the fibers from the clothes came from a bedspread constructed using the same materials.

Assuming, arguendo, that the challenged testimony was improperly admitted into evidence, we believe the defendant has failed to show actual prejudice. An erroneous admission of evidence is prejudicial, or reversible error if "there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at trial . . ." N.C. Gen. Stat. § 15A-1443(a); *See: State v. Corbett,* 307 N.C. 169, 297 S.E. 2d 553 (1982) and *State v. Wood,* 306 N.C. 510, 294 S.E. 2d 310 (1982), *later app.,* 310 N.C. 460, 312 S.E. 2d 467 (1984).

Given the overwhelming evidence against the defendant, it is clear that the error, if any, was harmless. Accordingly, defendant is not entitled to relief from this assignment of error.

[2] Defendant next contends that his constitutional rights were violated during the State's final argument by the prosecutor improperly commenting on defendant's failure to testify. The prosecutor made repeated references to the fact that the evidence presented by the State was "uncontroverted" or "uncontradicted." Defendant construes the prosecutor's remarks as a comment on the defendant's failure to testify. We do not agree with this contention.

Under the Fifth and Fourteenth Amendments, the defendant has a right to remain silent, thus any comment by the prosecutor on the defendant's failure to take the stand and testify is impermissible. *Griffin v. California,* 380 U.S. 609, 14 L.Ed. 2d 106, *reh. den.,* 381 U.S. 957 (1965); *State v. McCall,* 286 N.C. 472, 212 S.E. 2d 132 (1975), *later app.,* 289 N.C. 512, 223 S.E. 2d 303, *vacated in part,* 429 U.S. 912, 50 L.Ed. 2d 278 (1976). However, the State may, in its closing argument, properly bring to the jury's attention the defendant's failure to produce exculpatory evidence or to contradict the State's evidence. *State v. Jordan,* 305 N.C. 274, 280, 287 S.E. 2d 827, 831 (1982); *State v. Williams,* 305 N.C. 656, 675, 292 S.E. 2d 243, 255, *cert. den.,* 459 U.S. 1056, 74 L.Ed. 2d 622 (1982). We interpret the challenged arguments of the prosecutor to be directed at the defendant's failure to offer evidence rebutting the State's case rather than directed at his failure to take the stand. Defendant asserts that since the defendant was the only available witness who could have contradicted the State's evidence, the prosecutor's comment must be construed as a comment on the defendant's failure to testify. In evaluating a prosecu-

tor's argument that the State's case was "uncontradicted," we do not consider the unavailability of witnesses for the defense to be a determinative factor. This is not a case where evidence, necessary to contradict that of the State, would have to come from the defendant himself. Here, the State's evidence consisted of considerably more than the victim's testimony of what happened. There was testimony involving, for example, the fibers found on the victim's clothing and the results of the physical examination made of the victim. There was evidence relating to the victim's conversation with his mother immediately after the assault, the victim's statement to investigators, and various items allegedly found in defendant's apartment. Much of this evidence was theoretically contradictable by testimony of persons other than defendant. For this reason, the prosecutor's arguments do not constitute a comment on defendant's failure to testify.

The record reveals that defense counsel did not object to any of the prosecutor's argument concerning the State's "uncontroverted" evidence. However, in his closing argument he carefully, and effectively we believe, reminded the jury that the State had the burden of proving each and every element of the crimes charged. The trial court, in its charge to the jury, instructed that a defendant is presumed to be innocent and that the burden of proof was on the State. Any alleged prejudice that may have resulted from the challenged remarks, were removed by the judge's additional instructions:

> In this case, the defendant has not testified. The law of North Carolina gives him this privilege. This same law also assures him that his decision not to testify creates no presumption against him. Therefore, his silence is not to influence your decision in any way.

This assignment of error is overruled.

[3] As his third assignment of error, defendant challenges the trial court's instructions on the offense of first-degree sexual offense. He contends that these instructions deprived him of his right to a unanimous verdict, by permitting the jury to return a verdict of guilty without being unanimous about which particular criminal act defendant committed.

The indictment charged the defendant with unlawfully engaging in a sexual act with the prosecuting witness, without specifying what act was performed. The State's evidence tended to show the commission of two distinct offenses of first-degree sexual offense, to wit, anal intercourse and fellatio.

The trial judge instructed that the State was required to prove four elements beyond a reasonable doubt, the first being that a sexual act occurred. A sexual act was explained as meaning oral sex or anal intercourse. After properly advising the jury as to the remaining three elements, the trial judge then instructed that the jury must return a verdict of guilty if they found that the defendant engaged in "oral sex or anal sex" with the victim and if they found all the other elements of first-degree sexual offense.

It appears, from a disjunctive reading of the trial court's charge, that such instructions would allow the jury to return a guilty verdict if they found that defendant committed either of the distinct offenses, without requiring that all twelve members agree as to the guilt on at least one of the offenses. Defendant argues that possibly six of the jurors could have found him guilty of anal intercourse, while the remaining six jurors could have found him guilty of the act of oral sex. Thus, under these circumstances, there would be no unanimity among the jurors as to the specific crime committed.

However, the trial judge continued his charge to the jury on the sexual offense with the following instruction:

> However, if you do not so find or if you have a reasonable doubt as to one or more of these things, it would be your duty to return a verdict of not guilty as to this charge.

The trial court clearly informed the jurors that they must agree on all the elements before a verdict of guilty could be reached. However, immediately thereafter, the jury was given instructions on the requirement of unanimity.

> Your verdicts must be unanimous. You may not take a vote by majority, but all twelve of the retiring jurors must agree as to what your verdict will be in each case. . . . It is your duty to reason together with your fellow jurors, to discuss

the evidence at some length until you feel there is some consensus about the facts . . .

These instructions, when read as a whole, obviously required a verdict of not guilty if all twelve jurors were not satisfied beyond a reasonable doubt that the defendant participated in either fellatio or anal intercourse, or both. We believe the evidence amply sustains a conviction for either or both offenses. Nothing in the record indicates any confusion, misunderstanding or disagreement among the jury members regarding the unanimity of the verdict. The convincing inference is that the jury unanimously agreed that defendant engaged in both oral and anal sex.

This Court has considered a similar argument in *State v. Hall*, 305 N.C. 77, 286 S.E. 2d 552 (1982). There the bill of indictment charged the defendant with one count of armed robbery involving the taking of personal cash from the gas station attendant and from the gas station. The State's evidence that the defendant took both the money belonging to the attendant and the property of the gas station owner, resulted in defendant's conviction. The defendant argued that the failure of the trial court to instruct the jury that it must unanimously find that defendant committed both takings was error. We found defendant's contention that this instruction deprived him of his right to a unanimous verdict unpersuasive.

Although we are satisfied that the defendant, in this case, was not deprived of his right to a unanimous determination of his guilt, it is the better practice that trial judges in cases involving first or second-degree sexual offenses, submit separate issues of each unlawful sexual act if more than one act exists. This procedure would eliminate any possible confusion or claim of error with respect to the jury's verdict as to the particular transaction that constituted the unlawful sexual act. We recommend that in the future trial judges abide by this practice of submitting separate issues.

We have carefully examined all the assignments of error and conclude that no prejudicial errors were committed.

Accordingly, we find no error.

No error.