STATE OF NORTH CAROLINA v. VESTER TERRY SNEEDEN

No. 58A93

(Filed 17 June 1994)

### Evidence and Witnesses § 727 (NCI4th) — rape — admission of prior conviction — no prejudicial error

Any error in the admission of testimony concerning a prior rape and conviction in a prosecution for first-degree rape, first-degree sexual offense, and kidnapping was not prejudicial where the evidence against defendant, including the victim's testimony at trial, her statements made to others following the incident, and the testimony and photos relating her physical and emotional condition following the incident, is overwhelming. There is no reasonable possibility that the jury would have reached a different result if testimony concerning the prior rape had not been admitted.

**Am Jur 2d, Trial § 1121.**

Appeal by defendant under N.C.G.S. § 7A-30(2) from the decision of a divided panel of the Court of Appeals, 108 N.C. App. 506, 424 S.E.2d 449 (1993), finding no error in defendant's trial before, and sentences imposed by, Bowen, J., presiding at the 29 January 1991 Criminal Session of Superior Court, Harnett County. Heard in the Supreme Court 12 May 1993.

*Michael F. Easley, Attorney General, by Grayson G. Kelley, Special Deputy Attorney General, for the State-appellee.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Mark D. Montgomery, Assistant Appellate Defender, for defendant-appellant.*

EXUM, Chief Justice.

Upon proper indictments duly returned, defendant was tried and convicted of two counts of first degree rape, one count of first degree sexual offense, and one count of kidnapping — all committed against Angela Hatfield. He was sentenced to consecutive life terms for both rape convictions and to another consecutive life term for the sexual offense conviction. He was sentenced to nine years on the kidnapping conviction.

On appeal to the Court of Appeals, the majority of the panel found no error and thus affirmed the convictions. Judge Greene, however, dissented as he found error in the admission of the testimony of Mary Jo Welch Thaxton relating to her rape by defendant in 1967, for which defendant was convicted. *See State v. Sneeden*, 274 N.C. 465, 164 S.E.2d 7 (1968). Thus, the issue before this Court is whether defendant is entitled to a new trial due to the admission of Thaxton's testimony.

After carefully reviewing the case, we conclude that assuming, *arguendo*, the admission of the challenged evidence of the 1967 rape was error, the other clearly admissible evidence against defendant so overwhelmingly pointed to his guilt of the crimes charged that there is no reasonable possibility another result would have obtained had the challenged evidence not been admitted. Any error in the admission of this evidence is therefore not prejudicial, thus defendant is not entitled to a new trial. N.C.G.S. § 15A-1443(a) (1988).

The State's principal witness was Angela Hatfield, the victim, who testified in great detail about her abduction and rape by defendant on 17 July 1990. Hatfield, nineteen at the time of the incident, testified that on 17 July 1990 she drove to the unemployment office in downtown Fayetteville looking for work. Defendant, whom she had never seen before, pulled up beside her in his vehicle and said that he was looking for a secretary. Further conversation with defendant led Hatfield to believe that defendant owned or worked for a construction company and that he had a secretarial position which he was willing to offer her.

Defendant then requested Hatfield to follow him to Eutaw Shopping Center, the place where she supposedly would be working, and then to some job sites since her job would entail travelling to those sites during the day. Along the way defendant pulled over and convinced Hatfield to ride in his car. As defendant was driving through Harnett County with Hatfield he stopped near a pond purportedly to look at the fish. Defendant then went around to the passenger side of the car, where Hatfield was seated, and asked her to exit the car and look around. Hatfield complied and defendant continued to talk about the development of the area.

As defendant was directing Hatfield's attention toward the property he put a handcuff on her left hand. A struggle ensued in which defendant punched Hatfield in the jaw, at which time he was able to handcuff her other hand behind her back. Defendant

then showed Hatfield a gun and threatened to kill her. Hatfield asked defendant what he wanted, to which he replied that he wanted sex. Defendant then blindfolded Hatfield.

Defendant drove a short distance and stopped. Defendant led Hatfield, who was still blindfolded, inside a house. He took her to a back room and removed the blindfold and the handcuffs. Defendant then removed Hatfield's clothing. Threatening her with the gun, defendant proceeded to force Hatfield to perform oral sex on him. He then had vaginal intercourse with her. Defendant later forced her to engage in vaginal intercourse again. Hatfield then asked defendant if she could leave. Defendant responded affirmatively. The two exited defendant's house and defendant gave Hatfield her keys, which were in the back of his car.

Hatfield then drove to a car dealership where her boyfriend, Brian Heath Brown, worked. Hatfield was met there by Greg Elmore, an employee of the dealership who was a close friend of Brown and Hatfield. Brown soon approached Hatfield and Elmore, discovered what had happened, and drove her to the fire station, where his father worked. At the fire station Hatfield related the events of the rape to Brown's father.

Brown then proceeded to the hospital with Hatfield. At the hospital, Hatfield told nurse Angelika Streb what happened to her. A rape kit test was administered and photographs of bruises and scratches on her wrists, legs, jaw, and back were taken. Hatfield was then met by Lieutenant Atkins of the Harnett County Sheriff's Department.

Hatfield took Atkins to defendant's house and showed him the job sites she had seen earlier. She gave Atkins a full account of the incident with defendant. Hatfield later identified defendant from a picture lineup. At that time, Atkins took pictures of bruises and scratches on her body.

The State then proceeded to call numerous witnesses who corroborated Hatfield's testimony. James Gregory Elmore and Brian Heath Brown corroborated Hatfield's account of the events at the car dealership. When Hatfield arrived on 17 July 1990 she was crying and was having difficulty breathing. Hatfield told Elmore that she had been raped. Elmore grabbed her because she was having difficulty standing. She had several wounds, her hair was

"messed up," and her clothes were "messy." Brown took her to his father's fire station and then to the hospital.

Samuel H. Brown, the father of Brian Heath Brown, testified that when he saw Hatfield at the fire station where he worked she was hysterical and crying. She told him in detail the events subsequent to meeting the defendant earlier that day. Her hair was "disarrayed" and her wrist and jaw were injured.

Angelika Streb, the nurse who examined Hatfield at the hospital after the incident, explained the rape kit test she administered and related the description of events Hatfield described at the hospital. Streb wrote down the statements made by Hatfield and repeated them to Hatfield for verification. Streb also described injuries to Hatfield's arms, wrists, buttocks, shoulder, legs and jaw.

Dr. Reginald Sherard, who examined Hatfield following the incident, testified as to wounds found on Hatfield's jaw, neck, wrist, back and leg. He also testified to the rape kit test that was performed on Hatfield, which consists of obtaining the physical history of the victim and an examination for physical injuries, including a pelvic examination. Sherard found semen in Hatfield's vagina.

Officer Alan Dezzo of the Harnett County Sheriff's Department testified that at 2:40 p.m. on 17 July 1990 he went to the hospital responding to a call. Detective John Atkins interviewed Hatfield in Dezzo's presence after Hatfield completed the physical examination. Hatfield then took the officers to the site of the offense. Dezzo then testified to the statement given by Hatfield, which corroborated in detail the account as given by Hatfield in court.

Lieutenant John Atkins, a deputy sheriff and detective with Harnett County, testified that he was called to Cape Fear Valley Hospital by Officer Dezzo. There he met with Dezzo and Hatfield, whom he described as "distraught, withdrawn." Atkins photographed her wounds and obtained a complete description of the events of 17 July 1990. Hatfield then took Atkins and her father to the house where she had been raped. Later Atkins showed Hatfield a number of photographs including one of the defendant, and Hatfield picked out the photograph of the defendant as her assailant.

Belinda Hatfield, the victim's mother, testified that on 17 July 1990 her daughter told her she was going to look for a job. Belinda arranged to have lunch with her daughter Angela at their house at 12:30 p.m., and she became concerned when her daughter did

not arrive. She testified that it was unusual for her daughter to not call if she were going to be late. After 2:00 p.m. she received a call from Brian Brown indicating that Angela was at Cape Fear hospital. At the hospital she saw her daughter Angela, who was crying and very upset. She testified that Angela was very withdrawn that evening and that she would vacillate from being tearful to being silent. Angela did not sleep that night.

Angela's father testified that he went to Cape Fear hospital after receiving a phone call from his daughter's boyfriend. At the hospital Angela, who was "upset," told him that she'd been hand-cuffed and raped by a man larger than two hundred and fifty pounds. He testified that Angela was ninety-eight pounds. He noticed several injuries on Angela, including bruises to her legs, wrist and shoulder. He, Angela, and Lieutenant Atkins then went to the house to which she had been taken. He testified that Angela had trouble sleeping for nights after the assault.

Brenda Kay Bissette, an expert in forensic serology, testified that the body fluids present on Hatfield's panties originated from the semen of a male who had a certain type of semen present in only six percent of the male population, which matched the defendant's semen based on an analysis of defendant's blood.

Mary Jo Welch Thaxton testified that she had been raped by the defendant in 1967. According to Thaxton, the defendant, posing as a graduate student, met her at a bus station where she was waiting for a bus. He explained that he worked for a car rental company and that if she would help him deliver a car to a client, he would drive her to Greensboro. Defendant took her to a house, where he knocked her out and raped her. For this crime defendant was convicted and sentenced to life imprisonment, but was paroled in 1977. See State v. Sneeden, 274 N.C. 465, 164 S.E.2d 7 (1968).

The State then called Carla Wood. Wood testified that she had known defendant for many years. Several days prior to the incident with Hatfield, defendant invited her to look at his house for the purpose of hiring her to perform cleaning services. Defendant offered Wood money for sex and attacked her with a pistol when she refused. Wood was able to escape but did not report this incident to the police. Previously, defendant had given Wood $300.

The defense consisted of attempting to show that Hatfield consented to having sexual intercourse with defendant. Defendant testified that on 19 February 1990 he met Hatfield at a gas station. According to defendant, they began talking and he offered her a job. Over the next few days they met twice. They subsequently had sex at his house where he paid her $200. Defendant lost contact with Hatfield until May, when she went to his house for money. The next time he saw Hatfield was on 17 July 1990 at the unemployment office. She decided that the line was too long and followed defendant to his house, where she asked him for marijuana.

They then went to a pond to look at fish. Hatfield was playing with defendant's handcuffs when she put them on herself. Defendant did not have the key with him. Hatfield struggled with the handcuffs, which caused bruising and abrasions on her wrists. They returned to defendant's house, where the handcuffs were removed. They then engaged in oral sex and vaginal intercourse. Although defendant offered Hatfield $200, he did not have the money. Hatfield then became angry and left. Defendant was arrested that night in Fayetteville.

Defendant also testified that he had undergone several operations on his back and one on his hand. He suffered from phlebitis and had undergone triple bypass surgery. According to defendant, the condition of his heart renders him without much strength and with almost no stamina. Defendant denied attempting to have sex with Carla Woods, but he did acknowledge that she visited him on two occasions.

Elizabeth Brown Degon testified that she saw Hatfield and defendant sitting and talking in her restaurant in the "first quarter" of 1990. Degon, however, previously had been unable to identify a photograph of Hatfield when questioned by Officer Atkins. Degon also testified that defendant came into her restaurant with several different young women. Pete Eckley, a "very good friend[ ]" of defendant, and his employee Walter Bauer, also a "good friend" of defendant, testified that Hatfield had come to Eckley's garage with defendant in March 1990. They also testified that they often saw defendant with young women, especially blondes, and that he liked to "parade his women around." Mary Marx, defendant's neighbor, testified as to defendant's infirmities, which caused him to get out of breath simply by walking across a room.

STATE v. SNEEDEN

[336 N.C. 482 (1994)]

Thus, under both the State's version of events and the account put forth by the defendant it was undisputed that Hatfield went with defendant into his house and had sexual intercourse with him there. On this presentation of evidence, therefore, the only issue for the jury was whether Hatfield consented to being taken to defendant's house and whether she consented to the sexual acts committed there. The jury found these acts by Hatfield to be nonconsensual, and thus convicted defendant of two counts of first degree rape, one count of first degree sexual offense, and one count of kidnapping. The issue before us is whether the admission of Thaxton's testimony was prejudicial error. An error by the trial court does not require reversal where there is no reasonable possibility that the result would have been different without the error. N.C.G.S. § 15A-1443(a) (1988); *State v. Turner*, 268 N.C. 225, 150 S.E.2d 406 (1966).

It first bears emphasis that Hatfield's testimony was thorough and detailed. She described with precision the events in downtown Fayetteville, at the shopping center, at the pond and finally at defendant's house. Her account was internally consistent and consistent with the physical evidence.

Several persons corroborated Hatfield's testimony by testifying that Hatfield related the same account to them on 17 July 1990. Upon leaving defendant's house, Hatfield drove straight to the car dealership. She was immediately taken to the fire station, where she informed Samuel H. Brown, the father of Brian Brown, that she had been raped. She proceeded to tell Samuel Brown in exacting detail the events leading up to, during, and following the rape. She was then taken to a hospital, where nurse Streb administered the rape kit test, which includes asking the victim to recount the events of the rape. Hatfield related to Streb in detail the events surrounding the rape. Later that same day Hatfield was interviewed by officers Atkins and Dezzo at the hospital, at which time she gave a thorough description of the events of the day. The accounts Hatfield gave to Brown, Streb and Dezzo were nearly identical to Hatfield's testimony at trial.

These witnesses who corroborated Hatfield's version of events critically diminish any effect that Thaxton's testimony may have had. It is almost inconceivable that, as defendant would have the jury believe, Hatfield concocted her story between the time she left him and the time she arrived at the car dealership. Similarly,

it is incredulous that Hatfield could recite her version, were it not true, with precise consistency several times on that same day. The only motive suggested by the defendant for Hatfield's statements to her family, her friends, the police and hospital personnel that she had been raped was that defendant reneged on his promise to pay her $200.

The evidence of Hatfield's physical appearance likewise supports her account. Nurse Streb, Dr. Sherard, Samuel Brown, and Edgar Hatfield testified that Angela Hatfield had numerous scratches and bruises to her wrists, legs, shoulder, jaw and neck. At trial the State introduced photographs of Hatfield's wounds that were taken on the evening of 17 July 1990 and later during the same week. Elmore and Brian Brown testified that at the dealership Hatfield was "bent over," she was having difficulty breathing, and her hair and clothes were messy. In fact, she could not stand on her own. Samuel Brown corroborated that Hatfield appeared "disarrayed."

The defense only addressed the injuries to Hatfield's wrists, asserting that these wounds occurred when Hatfield voluntarily put the handcuffs on herself. While we note that this version is inherently questionable in that it asserts that Hatfield's injuries were self inflicted, it totally fails to explain the numerous other injuries to Hatfield's body.

Similarly, the evidence of Hatfield's emotional condition bolstered her account. Several witnesses testified that she was hysterical and crying at the dealership and at the fire station. At the hospital she was described as upset, distraught and withdrawn. Hatfield's parents testified that Angela was withdrawn that evening and that she would become silent and then cry. In addition, she could not sleep that night and she had trouble sleeping on the following nights. This evidence is a strong indication that Hatfield suffered a traumatic event, such as a rape, on 17 July 1990. Aside from implying that Hatfield falsified her emotions after the incident at defendant's house in response to defendant's failure to pay her $200, the defense did not otherwise explain Hatfield's emotional reactions.

Thus the State's evidence, including Hatfield's testimony at trial, her statements made to others following the incident, and the testimony and photos relating her physical and emotional condition following the incident, is overwhelming. In light of this over-

whelming evidence of defendant's guilt, there is no reasonable possibility that the jury would have reached a different result if Thaxton had not testified and thus any error in the admission of her testimony would not be prejudicial. *See, e.g., State v. Foust*, 311 N.C. 351, 357, 317 S.E.2d 385, 388 (1984) (in light of overwhelming evidence that defendant raped victim, including victim's testimony which was corroborated by physical evidence, any error in admission of expert testimony relating to fibers was not prejudicial); *State v. Taylor*, 304 N.C. 249, 270, 283 S.E.2d 761, 775 (1981), *cert. denied*, 463 U.S. 1213, 77 L. Ed. 2d 1398, *reh'g denied*, 463 U.S. 1249, 77 L. Ed. 2d 1456 (1983) (since evidence that defendant was guilty of murder, kidnapping, robbery and assault was overwhelming based on eyewitness accounts, error in admission of defendant's statement that he had once abducted and shot a white girl was not prejudicial); *State v. Spaulding*, 288 N.C. 397, 407-08, 219 S.E.2d 178, 185 (1975), *rev'd on other grounds*, 428 U.S. 904, 49 L. Ed. 2d 1210 (1976) (in light of overwhelming evidence of defendant's guilt of murder, such as testimony that defendant was seen over victim shortly before his death and that defendant was covered in blood, any error in admission of statements of co-defendants was harmless).

The decision of the Court of Appeals is, therefore,

AFFIRMED.