STATE OF NORTH CAROLINA v. DAVID EARL HUFFSTETLER

No. 329A83

(Filed 6 November 1984)

1. Jury § 6— individual voir dire—sequestration of the venire—prohibition of jury dispersal—refused—no abuse of discretion

There was no abuse of discretion in the trial court's denial of defendant's motions for individual *voir dire* of the venire, for sequestration of the venire, and to prohibit jury dispersal.

2. Criminal Law § 135.3; Jury § 7.11; Constitutional Law § 63— death qualifying the jury proper—death penalty constitutional

There was no error in "death qualifying" the jury, and North Carolina's death penalty statutes are constitutional.

3. Criminal Law § 99.2— court's opening comments to the jury—necessity for sentencing hearing—no prejudice

There was no prejudice in the trial court's opening remark to the jury that the court would be required to conduct a sentencing hearing if defendant should be found guilty, despite the provision in G.S. 15A-2000(a)(1) that the court is not required to hold a separate sentencing hearing if it is clear that no evidence of aggravating circumstances has been or will be introduced. The court's statement merely informed potential jurors that their function might involve determination of the appropriate sentence, a sentencing hearing was required, and defense counsel made almost identical statements to certain prospective jurors during the selection of the jury.

4. Criminal Law § 135.3— exclusion of venire—members opposed to death penalty—proper

Although a prosecutor's questions during *voir dire* included the incorrect assumption that a verdict of guilty of murder in the first degree standing alone might result in the imposition of the death penalty, jurors were properly excused for cause when they clearly indicated that they would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed.

5. Jury § 6.2— voir dire—instructions on the law by counsel

There was no error in sustaining objections to defense counsel's statements during *voir dire* concerning the significance of bills of indictment where the statements were efforts to instruct the jury on the law rather than questions designed to reveal bias.

6. Jury § 6.3— voir dire—repetitious questions—remotely relevant questions

The court did not err in refusing to permit defendant to question prospective jurors concerning the positions leaders of their churches held on the death penalty when each juror defendant sought to question had previously indicated that he or she had no moral or religious scruples concerning the death penalty, and when positions held by leaders of the jurors' churches would be remotely

relevant at best. Furthermore, a question to a prospective juror as to whether she had previously had any occasion to discuss her views on the death penalty was properly sustained as repetitious.

**7. Homicide § 20.1 — photographs — gruesome — admissible**

Photographs of the area where the victim's body was found were properly admitted because the photographs, although gruesome, illustrated the testimony of an officer as to conditions at the crime scene shortly after the body was discovered.

**8. Criminal Law § 42.3 — clothing — identification as defendant's — admissible**

There was no error in admitting items of clothing which allegedly belonged to defendant where the clothing was found in a plastic bag not far from the scene of the murder, where the clothing was covered with blood of a type consistent with that of the victim, and where defendant's wife identified two of the items unequivocally and described the third as being "like" defendant's. No objection was made to the testimony as to the third item at trial and the admission of that testimony did not amount to "plain error."

**9. Criminal Law §§ 50.1, 55.1 — expert opinion based in part on tests performed by someone other than witness — admissible**

There was no error in admitting the opinion testimony of an expert in the field of forensic serology which was partly based on lab tests performed by someone else because the tests are sufficiently reliable to support the admission of an expert opinion based on those tests. There was no violation of the Sixth Amendment because the defendant had the opportunity to fully cross-examine the expert testifying against him, and the jury had plenary opportunity to understand the basis for the expert's opinion and to determine whether that opinion should be found credible. G.S. 8C-1, Rule 703.

**10. Homicide § 21.5 — first degree murder — motion to dismiss — evidence sufficient**

There was sufficient evidence of premeditation and deliberation to submit first degree murder to the jury where the evidence showed an extremely brutal slaying of a sixty-five-year-old woman in her home; where the victim died as a result of numerous wounds to her face, head, neck, and shoulders inflicted over a period of some time; where there was substantial evidence from which to infer that many of the blows were inflicted after the deceased had been felled and rendered helpless; where there was no evidence of provocation on the part of the deceased; and where there was further evidence tending to support an inference of premeditation in that the telephone had been removed from its socket. G.S. 14-17.

**11. Criminal Law § 102.8 — prosecutor's argument to the jury — failure to produce exculpatory evidence**

In a first degree murder prosecution in which defendant did not testify, there was no error in allowing the prosecutor to argue to the jury that "there is no evidence that you heard in this case that is consistent with [the defendant's] innocence" where the prosecutor's comments did not go beyond direct rebuttal of the argument made previously by a defense attorney, and where the defense attorneys as well as the trial court reminded the jury that defend-

State v. Huffstetler

ant's silence created no presumption against him. Moreover, the State may properly bring to the jury's attention a failure to produce exculpatory evidence since exculpatory evidence need not come solely from a defendant's testimony.

12. **Criminal Law § 102.6— prosecutor's argument—within the bounds of discretion**

The trial court was within the bounds of its discretion in allowing a prosecutor's remarks, which, although touching upon matters not testified to, were reasonable inferences based on the evidence and were within the wide latitude properly afforded counsel in argument.

13. **Criminal Law § 120.1— first degree murder—failure to instruct that sentencing hearing not required if no aggravating circumstance**

The court did not err by failing to instruct the jury that a sentencing hearing would be held only if there was evidence of an aggravating circumstance because a sentencing hearing was, in fact, required, and because defendant did not show prejudice on appeal.

14. **Criminal Law § 101.4— jury review of photographs in jury room—no prejudice**

There was no prejudice when the court allowed the jury to take photographs which had been admitted into evidence into the jury room because defendant did not show a reasonable probability that a different result would have been reached had this error not been committed. G.S. 15A-1233(b), 15A-1443(a).

15. **Criminal Law § 135.8— aggravating circumstance—murder—especially heinous, atrocious or cruel—evidence sufficient**

The evidence presented by the State was sufficient to permit the jury to consider as an aggravating circumstance whether the murder was "especially heinous, atrocious or cruel" where the evidence showed that the victim died as a result of being battered to death by what can only have been a prolonged series of blows with a cast-iron skillet so severe as to fracture her skull, neck, jaws, and collarbone and to cause her skull to be pushed into her brain. G.S. 15A-2000(e)(9).

16. **Criminal Law § 135.6— sentencing hearing—exclusion of evidence harmless**

Any error in the trial court's refusal to permit the defendant's sister to testify to his nonviolent nature was harmless because his mother and wife testified that he was nonviolent and because the jury found his nonviolent past to be a mitigating circumstance.

17. **Criminal Law § 135.9— first degree murder—mitigating circumstance—admission of wrongdoing—evidence not sufficient**

The evidence was not sufficient to require the submission to the jury as a mitigating circumstance that defendant testified under oath and revealed his role in the victim's death where defendant's testimony, though a confession of guilt, came only after a jury had convicted him of first degree murder and was deciding between a life sentence and the death penalty; where his testimony sought to limit his personal responsibility by showing that drugs and alcohol

played a part in his killing of his mother-in-law; and where defendant indicated during his testimony that he had wanted to keep quiet during the sentencing hearing but that his wife and family wanted him to tell the truth.

**18. Criminal Law § 135.10— proportionality review of death sentence**

The record supports the submission of the aggravating circumstance which was considered and found by the jury and there was no indication that the death penalty was imposed under the influence of passion, prejudice, or arbitrary factors. Furthermore, the sentence of death was not disproportionate to those in the pool of similar cases where the record showed a senseless, unprovoked, exceptionally brutal, prolonged, and murderous assault by an adult male upon a sixty-five-year-old female in her home. G.S. 15A-2000(d)(2).

Justice MARTIN concurring.

Justices EXUM and FRYE dissenting as to sentence.

APPEAL from judgment and sentence of death entered by *Judge Forrest A. Ferrell* at the May 9, 1983 Session of Superior Court, GASTON County. The defendant was charged in a bill of indictment, proper in form, with the murder of Edna Cordell Powell. The jury found the defendant guilty of murder in the first degree and recommended a sentence of death. Judgment was entered sentencing the defendant to death, and the defendant appealed to the Supreme Court as a matter of right. Heard in the Supreme Court May 8, 1984.

*Rufus L. Edmisten, Attorney General, by Isaac T. Avery, III, Special Deputy Attorney General, for the State.*

*Robert W. Clark, Assistant Public Defender, for the defendant appellant.*

MITCHELL, Justice.

The defendant was convicted of the first degree murder of Edna Cordell Powell and sentenced to death. He brings forward assignments of error relative to the guilt-innocence phase of his trial and the sentencing phase. Having considered with care the entire record and each of the assignments, we find no prejudicial error in either phase of the defendant's trial. We do not disturb the defendant's conviction or the sentence of death.

The evidence as presented by the State tended to show that in December 1982 the defendant, David Earl Huffstetler, and his wife, Ruby Huffstetler, lived in a trailer on Highway 161 in Kings

Mountain. The deceased, Edna Powell, was Ruby Huffstetler's mother. She was sixty-five years old and lived in a trailer next door to the Huffstetlers. Mrs. Huffstetler visited her mother during the afternoon of December 31, 1982. Later that day Mrs. Huffstetler went with her daughter Kim to spend the night in a motel in Kings Mountain. Around 10:00 p.m. on that date, several long distance calls that she did not make were made from the telephone in the Huffstetler's trailer. Mrs. Huffstetler did not know where the defendant spent the night on December 31.

Another daughter of the deceased, Barbara Shannon, visited her mother at about 8:00 p.m. on December 31. During the time Mrs. Shannon and her family were visiting, Mrs. Powell received a telephone call. After the call, Mrs. Powell phoned her grand-daughter, Ruby Huffstetler's daughter Debbie Sutton, who lived with the Huffstetlers. Mrs. Powell asked her granddaughter where Mrs. Huffstetler was. After ending the conversation with her granddaughter, Mrs. Powell called the police. Mrs. Powell then went with the Shannons to their home in Gastonia to spend the night.

On January 1, 1983, at approximately 6:00 a.m., Mr. Shannon took Mrs. Powell back to her home in Kings Mountain. He left after checking throughout the trailer and finding nothing suspicious.

A friend of Mrs. Powell's from work, Miller Eugene Hughes, drove her to First Union Bank in Kings Mountain to do "some banking" on December 31, 1982. He also made plans with Mrs. Powell to take her to the Veterans Hospital in Asheville early on the morning of January 1 so that she could visit her husband. Mrs. Powell asked him to call her before he came by to pick her up on the morning of January 1. He called Mrs. Powell's trailer three times at about 7:50 a.m. on January 1, 1983. He received no answer. He called two more times after that, thirty to forty minutes apart, but never got a response.

Paul Glenn Sisk was working for the Yellow Cab Company on the morning of January 1. At about 8:00 a.m. a call came in to the dispatcher for the company, and Sisk answered the phone. Sisk recognized the defendant's voice. The caller identified himself as David Huffstetler. The caller asked that a cab be sent to a point on Highway 161 about two miles out of Kings Mountain at two

churches. William Wilde, another employee of Yellow Cab, drove a cab towards Kings Mountain to pick up David Huffstetler. Although he drove out toward Highway 161 he never found Huffstetler.

Alice Cantrell testified that the defendant was a friend of hers and that he came to visit her on January 1, 1983 at about 10:00 a.m. He came into the room where she was sleeping and asked if she wanted to shoot pool. Ms. Cantrell and the defendant stayed together all day long at the home of Ms. Cantrell's sister. The two worked on a car most of the day. The defendant, Ms. Cantrell and her two sons spent the night of January 1 in a motel in Kings Mountain. Ms. Cantrell and the defendant stayed together for two days after January 1 spending the second night in Ms. Cantrell's mother's home.

Debbie Sutton, the granddaughter of the deceased, testified that on January 1, 1983 she was living in the trailer where her mother Ruby Huffstetler lived with the defendant. She saw the defendant leave with her mother and her sister on December 31. Her mother came back home without the defendant. She later saw her mother on the evening of December 31 at a New Year's Eve party, but the defendant was not with her mother. Ms. Sutton returned to her mother's trailer around 4:00 a.m. on the morning of January 1, 1983. She stated that she went to bed and got up late the next day. She did not leave the trailer again that day.

The deceased's daughter, Mrs. Shannon, began to try to call her mother at her mother's trailer between 4:00 and 4:30 p.m. on January 1. She received no answer and continued to call every thirty minutes until 6:00 p.m. After a final unsuccessful attempt to reach her mother, she called Deborah Sutton and asked her to go to Mrs. Powell's trailer and tell Mrs. Powell to come to the phone. Ms. Sutton went next door to her grandmother's trailer. She opened the unlocked door, entered and found the body of Mrs. Powell lying on the floor of the kitchen. She testified that she could tell her grandmother was dead because her head was "bashed in."

The police were called at 7:15 p.m. on January 1 and arrived at the Powell residence shortly thereafter. Officer Richard Redding of the Gaston County Police Department testified that after being called to the Powell residence, he went inside the de-

ceased's trailer and observed Mrs. Powell lying in a large amount of blood on the kitchen floor. The blood was spattered along the dryer and on the refrigerator in the kitchen. He also observed a pair of false teeth located under the front edge of the clothes dryer. A black metal fragment was found on the east wall of the kitchen area. A wall style telephone was not hanging in its place in the entryway of the trailer, but instead had been placed in a chair at the entry point. Officers found hair samples and metal fragments on the carpet.

Law enforcement officers searched the area surrounding the victim's home and found a black plastic garbage bag containing bloodstained clothes approximately two-tenths of a mile from the victim's trailer. The bag contained a pair of jeans and a shirt identified by Mrs. Huffstetler as belonging to her husband, the defendant. The bag also contained a bloody crumpled bank envelope from First Union Bank and a pair of gloves identified by the defendant's wife as similar to a pair owned by her husband.

An S.B.I. hair analyst testified that several hairs found on the gloves were microscopically consistent with hairs taken from the victim. An S.B.I. forensic serologist testified that blood samples taken from the clothes found in the bag were consistent with the blood type of the victim and inconsistent with the blood type of the defendant.

Officers found a broken cast-iron skillet and its handle approximately a hundred feet from the defendant's trailer. The skillet was bloodstained and bore hairs microscopically consistent with the hair of the victim. The metal fragment found beside the head of the victim in her trailer fit into the broken skillet.

A pathologist, Dr. Phillip Leone, performed an autopsy on the body of the deceased. He testified that Mrs. Powell had multiple wounds and lacerations about her head, neck and shoulders. He found more than fourteen lacerations on her head and body. Both eyes were massively bruised and swollen shut, and blood was found in both nostrils and in her mouth. The victim's jaws were broken on both sides so that the lower jaw moved freely. The victim's spine and neck were fractured, as was her left collarbone. There was a large head wound behind the right ear in which the skull had been pushed into the brain. The pathologist also described a bilateral skull fracture and a "tremendous"

hemorrhage in the brain. The cause of death in the opinion of the pathologist was skull fractures, hemorrhaging, edema of the brain and injury to major life centers causing cardio-respiratory arrest. The pathologist testified that in his opinion the fourteen lacerations of the head were caused by separate blows and that an object such as a cast-iron skillet could have inflicted the wounds.

The defendant did not testify or offer evidence at the guilt-innocence phase of the trial. The jury found him guilty of murder in the first degree.

Prior to the sentencing hearing, the trial court disallowed the State's attempt to offer evidence that the defendant was involved in an armed robbery on the day of the murder. The State offered no further evidence but requested that the trial court submit as an aggravating circumstance that the killing was an especially heinous, atrocious or cruel murder under N.C.G.S. 15A-2000(e)(9).

The defendant testified in his own behalf at the sentencing hearing. He stated that he was taking $150 to $200 worth of the drug dilaudid per day at the time of the murder. He supported himself with money he got shoplifting and working.

On December 31, 1982, he went to the Yellow Cab Company and drank some liquor with employee Bill Wilde. He stole some money from the Yellow Cab Company at that time. He then went to a house in East Gastonia and injected two crushed up dilaudid pills. He got a ride home to his trailer on Highway 161 at about 10:00 p.m. on December 31. He drank some whiskey after arriving home and went to sleep. On rising the following morning, he injected two more dilaudid pills and drank more liquor.

The defendant testified that about 8:00 a.m. on January 1, 1983, he went next door to visit the deceased, his mother-in-law. After talking with Mrs. Powell a little, the defendant asked her whether she knew where his wife was. Mrs. Powell said that she did not and asked whether the defendant had been drinking. The defendant told Mrs. Powell that he had to have a drink around there to find out where his wife was because nobody would tell him anything. Mrs. Powell replied, "David, you're a darned liar. I don't know where she's at. All I know is you called me and said all hell was going to break loose if somebody didn't come and pick

you up." The defendant said, "I know I didn't say no such thing." Mrs. Powell replied, "I know you did."

The defendant testified that "we was just arguing, and I grabbed a frying pan and started hitting her." The defendant did not remember how many times he struck Mrs. Powell but testified that he was not angry with her. He stated that "it just happened in an argument." The defendant then left the trailer, went to his own trailer to change clothes and got a pair of gloves. He went back to his mother-in-law's trailer, picked up the frying pan while wearing the gloves, and threw the pan away. He put his bloodied clothes in a plastic trash bag and threw the trash bag away nearby. He then got a ride to the house where Alice Cantrell was staying. He stayed with Ms. Cantrell until his arrest on January 3.

Other members of the defendant's family testified that the defendant was not a violent or mean man when he was growing up. They had noticed little animosity between the defendant and his mother-in-law Mrs. Powell, the deceased.

The trial court instructed the jury that it could find as an aggravating circumstance that the murder was especially heinous, atrocious, or cruel. The trial court instructed that the jury could find in mitigation that: (a) the defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired; (b) the killing occurred contemporaneously with an argument between the defendant and the victim, a person whom he knew by virtue of the domestic relationship, and by means of an instrument acquired at the scene and not taken there; (c) the defendant did not have a history of violent conduct; and (d) any other mitigating circumstance arising from the evidence.

The jury found the murder of Edna Powell to be especially heinous, atrocious or cruel. They found the existence of the following mitigating circumstances: (1) that the defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired; (2) that the killing occurred contemporaneously to an argument and by means of an instrument acquired at the scene and not taken there; (3) that the defendant did not have a history of violent conduct. The jury specifically found that there were no other circumstances which it

deemed to have mitigating value. The jury returned a recommendation of death.

## GUILT-INNOCENCE PHASE

[1] The defendant first contends that the trial court erred when it denied his motions for individual *voir dire* of the jury venire and for sequestration of the jury venire. He also contends that the trial court erred when it denied his motion to prohibit jury dispersal. The defendant concedes that these matters are within the trial court's discretion and that error may be found only upon a showing of abuse of discretion. *State v. Stokes,* 308 N.C. 634, 304 S.E. 2d 184 (1983). The defendant acknowledges that he has shown no abuse of discretion. These contentions of error are without merit.

[2] The defendant next contends that the procedure of "death qualifying" the jury for the guilt-innocence phase of his trial resulted in a guilt prone jury and deprived him of a fair trial. We have repeatedly rejected such arguments. *E.g. State v. Murray,* 310 N.C. 541, 313 S.E. 2d 523 (1984). This contention of error is without merit.

The defendant also contends that the trial court erred by its failure to hold unconstitutional the North Carolina statutes providing for the imposition of the death penalty. On numerous occasions we have upheld the constitutionality of our death penalty statutes. *E.g. State v. Jackson,* 309 N.C. 26, 305 S.E. 2d 703 (1983); *State v. Rook,* 304 N.C. 201, 283 S.E. 2d 732 (1981), *cert. denied,* 455 U.S. 1038 (1982). This contention of error is without merit.

[3] The defendant next contends that the trial court made an inaccurate and prejudicial statement in its opening remarks to potential jurors. The trial court's statements were as follows:

> Now, members of the jury, first degree murder is a crime for which the death penalty may be imposed. Should the defendant be found guilty of first-degree murder by the jury, then in such event *the court will be required* to conduct a separate sentencing hearing before the trial jury to determine whether the defendant shall be sentenced to death or life imprisonment. It would be your duty to, after such sentencing hearing, recommend to the court whether the

defendant shall be sentenced to death or life imprisonment. Such a recommendation would be binding upon the court and that would be the sentence of the court. Before that time should occur, however, the sole responsibility of the trial jury is to determine from the evidence, beyond a reasonable doubt, that being the burden upon the State, whether the defendant is guilty of first degree murder or some lesser included offense about which the jury may be instructed, or not guilty.

(Emphasis added.) The defendant argues that this statement was inaccurate as it assumed that evidence of aggravating circumstances would be presented and a sentencing hearing required.

Although N.C.G.S. 15A-2000(a)(1) states that upon the adjudication of guilt of a capital felony, the trial court "shall" conduct a separate sentencing hearing, the trial court is not required to hold a separate sentencing hearing if it is clear that no evidence of aggravating circumstances has been or will be introduced. *State v. Johnson*, 298 N.C. 47, 257 S.E. 2d 597 (1979). In such cases the trial court may proceed to pronounce a sentence of life imprisonment without the intervention of the jury. *Id.*

The defendant has not shown how the statement of the trial court complained of in any way prejudiced him. The statement by the trial court merely had the effect of informing potential jurors that the jury's function might involve both a determination of guilt or innocence and a determination of the appropriate sentence. Since a sentencing hearing in fact was required, it is clear that the statement complained of did not prejudice the defendant. It is apparent that counsel for the defendant did not think the substance of this statement by the trial court harmful to his client, since he made almost identical statements to certain prospective jurors during the selection of the jury. The defendant having failed to show any prejudice resulting from the trial court's statement, his contentions concerning it are without merit and are rejected.

[4] The defendant next contends that the trial court erred in excluding certain prospective jurors for cause as a result of answers they gave concerning their views on capital punishment. The defendant argues that the questions asked these prospective jurors by the prosecutor did not address the issue of whether the pro-

State v. Huffstetler

spective jurors were irrevocably committed to vote against the penalty of death regardless of the evidence that might emerge in the course of the proceedings.

Although the prosecutor's questions included the incorrect assumption that under current North Carolina law a verdict of guilty of murder in the first degree standing alone might result in the imposition of the death penalty, the trial court did not err in excusing the prospective jurors for cause. The transcript of the jury *voir dire* reveals that each juror excused for cause as a result of his or her views on capital punishment clearly indicated that he or she would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed in the present case. Therefore, the trial court properly excused these jurors for cause. *Witherspoon v. Illinois*, 391 U.S. 510, 522-23, n. 21 (1968); N.C.G.S. 15A-1212(8).

[5] The defendant next contends that the trial court erred by preventing counsel for the defendant from discussing the meaning of a bill of indictment during the *voir dire* examination of prospective jurors. The defendant attempted several times to inform prospective jurors about the significance of a bill of indictment. Each time the trial court sustained the State's objection.

It is well established that the extent of the inquiry of a prospective juror rests within the trial court's discretion and will not be found to be reversible error unless an abuse of discretion is shown. *State v. Phillips*, 300 N.C. 678, 268 S.E. 2d 452 (1980). The defendant in the present case has failed to discuss with any specificity how he contends he was prejudiced by the trial court's rulings or how the trial court abused its discretion in this regard. We do not perceive how the ruling by the trial court in any manner involved an abuse of its discretion or prejudice to the defendant. The statements by counsel for the defendant concerning the significance of bills of indictment were not questions designed to reveal bias or questions at all. Instead, they were efforts by counsel to instruct the jury concerning the legal significance of bills of indictment. It was well within the discretion of the trial court to prohibit such attempts by counsel to give instructions on the law to prospective jurors during the *voir dire* examination. The trial court did not err in doing so in this case.

[6]　The defendant also contends that the trial court erred in refusing to permit the defendant to question prospective jurors concerning the positions leaders of their churches held on the death penalty. Each juror the defendant sought to question in this manner had previously indicated that he or she had no moral or religious scruples concerning the death penalty. Positions held by leaders of their churches would be remotely relevant at best for purposes of determining their fitness as jurors. The trial court did not abuse its discretion in the present case by refusing to allow such questions.

The defendant further contends that the trial court erred in sustaining an objection to his question to a prospective juror as to whether she had previously had any occasion to discuss her views on the death penalty. The question was repetitious, since the prospective juror had already given a negative answer. The trial court did not abuse its discretion or commit error by preventing repetitious questions to prospective jurors.

[7]　The defendant next contends that the trial court erred by admitting into evidence two photographs which depict the area in the victim's trailer where her body was found. The photographs, although gruesome, illustrate the testimony of Officer Richard G. Redding as to conditions at the crime scene when he arrived there shortly after the body was discovered. The fact that a photograph shows a horrible and gruesome scene does not render it incompetent. When properly authenticated, "photographs showing the condition of the body when found, its location when found, and the surrounding scene at the time the body was found are not rendered incompetent by the portrayal of gruesome events which the witness testifies they accurately portray." *State v. Elkerson*, 304 N.C. 658, 665, 285 S.E. 2d 784, 789 (1982). This contention is without merit.

[8]　The defendant next contends the trial court erred by admitting into evidence items of clothing which allegedly belonged to the defendant. The defendant argues that his wife did not identify the items as the defendant's with sufficient certainty to make them admissible.

It is axiomatic that any evidence calculated to throw any light upon the crime charged is admissible in criminal cases. *State v. Hunt*, 297 N.C. 258, 254 S.E. 2d 591 (1979); *State v. Sledge*, 297

N.C. 227, 254 S.E. 2d 579 (1979). The objects of clothing in question were found in a plastic bag not far from the scene of the murder and were covered with blood of a type consistent with that of the victim. The relevancy and admissibility of these items of clothing is obvious.

The real thrust of the defendant's arguments in support of his assignments and contentions concerning these items of clothing, however, seems to be that the defendant's wife should not have been permitted to testify that the clothing belonged to him, because her identification of the clothing as his was not sufficiently certain. This argument is equally without merit.

As to two of the items of clothing, a shirt and a pair of trousers, the defendant's wife could not have testified more clearly and unequivocally that they were the defendant's. There was no error in the admission of her testimony in this regard.

As to the remaining clothing, a pair of brown cotton gloves, the defendant's wife stated that: "David had a pair like that." No objection or motion to strike this testimony was made at trial. Therefore, the defendant is deemed to have waived the right to raise this alleged error on appeal. *State v. Oliver*, 309 N.C. 326, 307 S.E. 2d 304 (1983). We will not review or consider assignments of error on appeal in such situations unless it is shown that the trial court committed "plain error" within the meaning of *State v. Black*, 308 N.C. 736, 303 S.E. 2d 804 (1983). Here, it is clear that the testimony of the defendant's wife that he had a pair of gloves "like" those which had been introduced into evidence did not amount to "plain error." *See State v. Bass*, 280 N.C. 435, 186 S.E. 2d 384 (1972) (testimony that a jacket introduced into evidence was "similar" to one worn by the defendant held admissible).

[9] The defendant next contends that the trial court's admission into evidence of the opinion testimony of forensic serologist Brenda Bissette was error. After being properly qualified as an expert in the field of forensic serology, Ms. Bissette testified that based on the results of ten blood tests performed at the S.B.I. laboratory, her opinion was that the blood found on the clothing identified as the defendant's was consistent with the blood of the victim. She further stated that six-tenths of one percent of the population of the United States is known to share the characteris-

tics of the victim's blood. On cross-examination the serologist testified that although she had personally performed the test yielding the blood grouping, another individual in the S.B.I. lab performed tests requiring a process called electrophoreses. She stated that she could interpret and visually scan those tests results and determine that the electrophoreses tests had been properly conducted.

The defendant objected to the opinion testimony on grounds that the expert had not actually conducted some of the tests. The defendant contends that because he could not cross-examine the person who actually performed some of the tests, he was deprived of the right to confront his accusers guaranteed by the Sixth Amendment to the Constitution of the United States.

It has been held traditionally that an expert's opinion is not admissible if based on hearsay evidence. *Cogdill v. North Carolina State Highway Commission*, 279 N.C. 313, 182 S.E. 2d 373 (1971). That general rule has undergone significant modification in recent years, especially in the area of expert medical testimony. *See generally* Blakey, *Examination of Expert Witnesses in North Carolina*, 61 N.C. L. Rev. 2 (1982); 1 *Brandis on North Carolina Evidence*, § 136 notes 23 to 27 (2d rev. ed. 1982).

In *State v. DeGregory*, 285 N.C. 122, 203 S.E. 2d 794 (1974) this Court held admissible a psychiatrist's opinion based in part on information compiled in hospital records. The Court, through Justice Huskins, stated that "an expert witness has wide latitude in gathering information and may base his opinion on evidence not otherwise admissible." *Id.* at 132, 203 S.E. 2d at 801. In *State v. Wade*, 296 N.C. 454, 251 S.E. 2d 407 (1979), this Court stated:

(1) A physician, as an expert witness, may give his opinion, including a diagnosis, based either on personal knowledge or observation or on information supplied him by others, including the patient, *if such information is inherently reliable even though it is not independently admissible into evidence.* The opinion, of course, may be based on information gained in both ways. (2) If his opinion is admissible the expert *may testify to the information he relied on in forming it* for the purpose of showing the basis of his opinion.

296 N.C. at 462, 251 S.E. 2d at 412. (Emphasis added.) Further, we have held that testimony as to information relied upon by an expert when offered to show the basis for the expert's opinion is not hearsay, since it is not offered as substantive evidence. *State v. Wood*, 306 N.C. 510, 294 S.E. 2d 310 (1982). Such evidence is admissible due to the limited purpose for which it is offered and not due to an exception to the hearsay rule. *Id.*

In general, the admission of "inherently reliable" information to show the basis for an expert's opinion has occurred in cases involving medical or psychiatric experts. *See, e.g. State v. Jackson*, 302 N.C. 101, 273 S.E. 2d 666 (1981) (psychiatrist based opinion on tests not personally administered by him); *State v. Franks*, 300 N.C. 1, 265 S.E. 2d 177 (1980) (psychiatrist's opinion based on examination as well as patient's statements); *Booker v. Duke Medical Center*, 297 N.C. 458, 256 S.E. 2d 189 (1979) (no error in allowing physician to testify based on medical history obtained from a treating physician and the patient). In at least two cases decided prior to the pronouncement of the inherent reliability rule in *Wade*, however, this Court upheld the admission of non-medical expert opinion based on information not otherwise admissible. In *State v. Louchheim*, 296 N.C. 314, 250 S.E. 2d 630, *cert. denied*, 444 U.S. 836 (1979), an expert in the field of accounting gave his opinion based on documents not in evidence. The auditor testified about where he got the documents, what the documents contained and how he used them. This Court found no error in the admission of the testimony. In *State Highway Commission v. Conrad*, 263 N.C. 394, 139 S.E. 2d 553 (1965) this Court found no error in the admission of an opinion of a real estate appraiser, even though the opinion was based on information not admissible as substantive evidence.

The rule permitting experts to testify to opinions they have formed based on information not itself admissible as substantive evidence is not limited to opinions of physicians and other medical experts. Under the standard set forth in *Wade*, the standard applicable to this case, the tests forming the basis of the serologist's testimony are sufficiently reliable to support the admission of her expert opinion based upon those tests.

We note here that, effective July 1, 1984, N.C.G.S. 8C-1, Rule 703 provides that:

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type *reasonably relied upon* by experts in the particular field in forming opinions or inferences upon the subject, the facts or data *need not be admissible in evidence*.

(Emphasis added.) Several commentators have suggested that there is little difference in the "inherently reliable" standard adopted by this Court in *Wade* and the "reasonably relied upon" standard of the new rule. *See* Blakey, *Examination of Expert Witnesses in North Carolina*, 61 N.C. L. Rev. 2, 26-27 (1982); 1 *Brandis on North Carolina Evidence*, § 136 (2d rev. ed. Supp. 1983). It is also clear that the new rule is not confined in its application to medical and psychiatric expert testimony.

The admission into evidence of expert opinion based upon information not itself admissible into evidence does not violate the Sixth Amendment guarantee of the right of an accused to confront his accusers where the expert is available for cross-examination. *U.S. v. Williams*, 447 F. 2d 1285 (5th Cir. 1971) (en banc), *cert. denied*, 405 U.S. 954, *reh. denied*, 405 U.S. 1048 (1972). *Cf. U.S. v. Lawson*, 653 F. 2d 299 (7th Cir. 1981) (where it was recognized that the introduction of expert testimony based largely on hearsay may create constitutional problems if there is no adequate opportunity to cross-examine the expert and the defendant does not have access to the information relied upon by the witness), *cert. denied*, 454 U.S. 1150 (1982). In such cases the defendant will have the right to fully cross-examine the expert witness who testifies against him. He will be free to vigorously cross-examine the expert witness, as did the defendant in the present case, concerning the procedures followed in gathering information and the reliability of information upon which the expert relies in forming his opinion. The jury will have plenary opportunity, as did the jury in this case, to understand the basis for the expert's opinion and to determine whether that opinion should be found credible. The opportunity to fully cross-examine the expert witness testifying against him will insure, as in the present case, that the defendant's right to confront and cross-examine his accusers guaranteed by the Sixth Amendment is not denied. The trial court did not err in admitting the expert testimony complained of here.

[10] The defendant next contends that the trial court erred when it denied his motions to dismiss at the close of the State's case and at the close of all of the evidence. He argues that the State did not offer sufficient evidence of premeditation and deliberation to permit submission of the charge of first degree murder to the jury.

Before the question of a defendant's guilt may be submitted to the jury for its consideration, the trial court must find that substantial evidence has been introduced tending to prove each essential element of the offense charged and that the defendant was the perpetrator. *State v. Powell*, 299 N.C. 95, 261 S.E. 2d 114 (1980). Substantial evidence must be existing and real but need not exclude every reasonable hypothesis of innocence. *State v. Williams*, 308 N.C. 47, 301 S.E. 2d 335 (1983), *cert. denied*, --- U.S. ---, 78 L.Ed. 2d 177 (1983). The evidence must be viewed in the light most favorable to the State. The State is entitled to every reasonable intendment and inference to be drawn therefrom. Contradictions and discrepancies are for the jury to resolve and do not warrant dismissal. *State v. Powell*, 299 N.C. 95, 261 S.E. 2d 114 (1980).

First degree murder is the intentional and unlawful killing of a human being with malice and with premeditation and deliberation. N.C.G.S. 14-17. *State v. Fleming*, 296 N.C. 559, 251 S.E. 2d 430 (1979). Premeditation has been defined as thought beforehand for some length of time however short. *State v. Biggs*, 292 N.C. 328, 233 S.E. 2d 512 (1977). No particular amount of time is required for premeditation. *State v. Myers*, 299 N.C. 671, 263 S.E. 2d 768 (1980). Deliberation is an intention to kill executed in a cool state of blood in furtherance of a fixed design, to gratify a feeling of revenge or to accomplish some unlawful purpose and not under the influence of a violent passion suddenly aroused by some lawful or justifiable cause. *Id.*

Since premeditation and deliberation are processes of the mind, they are not ordinarily subject to direct proof but generally must be proved if at all by circumstantial evidence. *State v. Buchanan*, 287 N.C. 408, 215 S.E. 2d 80 (1975). Among other circumstances which will tend to show that a killing was with premeditation and deliberation are: (1) want of provocation on the part of the deceased; (2) the conduct and statements of the de-

fendant before and after the killing; (3) threats and declarations of the defendant before and during the course of the occurrence giving rise to the death of the deceased; (4) ill-will or previous difficulty between the parties; (5) the dealing of lethal blows after the deceased has been felled and rendered helpless; and (6) evidence that the killing was done in a brutal manner. *State v. Williams*, 308 N.C. 47, 69, 301 S.E. 2d 335, 349, *cert. denied*, --- U.S. ---, 78 L.Ed. 2d 177 (1983).

The evidence in the present case shows the extremely brutal slaying of a sixty-five year old woman in her home. Mrs. Powell died as a result of numerous wounds to her face, head, neck and shoulders inflicted over a period of some time. There is substantial evidence from which it is reasonable to infer that many of the blows were inflicted after the deceased had been felled and rendered helpless. There is no evidence of provocation on the part of the deceased. The removal of the telephone from its socket is further evidence tending to support an inference of premeditation or deliberation.

The evidence in support of premeditation and deliberation justified submission of the charge of first degree murder to the jury. The defendant's contention is without merit.

[11]  The defendant next contends that prejudicial error occurred during the prosecutor's closing argument before the jury. The defendant argues that the prosecutor's comments constituted improper references to the defendant's decision not to testify during the guilt-innocence phase of his trial. During the closing arguments the attorney for the defendant argued as follows:

Now, of course, when a defendant is accused of a crime and he is brought to trial, if the State—if the defendant does not present any evidence the defendant doesn't present any evidence, then his counsel has the right of the opening argument, just as I am doing now, and closing argument. That is, Mr. Hill will argue to you after I'm finished here. Then Mr. Clark will argue to you, a closing argument for the defendant. The defense argues this is a very important argument and certainly something the defendant considers when he decides not to present any evidence.

When the State's turn to present an argument came, the prosecutor argued:

> Mr. Harris, when he opened his argument to you, gave to you some reasons that he made up, but yet you haven't heard any evidence as to why. That he must have a great value on his, he and Mr. Clark's, ability to stand before you and orate, make a great moving speech which will outweigh the evidence you heard last week in this trial. It's just pure vanity, ladies and gentlemen. This is not a game, as he indicated to you. When you came to sit as a juror in this case, it was said to you individually and you heard us repeat it to other jurors, that you could consider in your deliberations only that evidence that you hear here in the courtroom, and the only evidence that you heard was the evidence presented by the State. It would seem to me a rather vain thing on behalf of Mr. Harris and Mr. Clark to get up and to argue to you that the reason that they did not offer evidence was so that they could have the final argument. I don't think—believe—that you're such short-minded people—
>
> MR. HARRIS: Objection.
>
> THE COURT: Overruled.
>
> MR. HILL: —that you can't remember thirty minutes what occurred and they can talk to you and explain the evidence that they contend is consistent with his innocence. Ladies and gentlemen, there is no evidence that you heard in this case that is consistent with his innocence. No reasonable theory that is consistent with his innocence.

Arguments of counsel are largely in the control and discretion of the trial court. The appellate courts ordinarily will not review the exercise of that discretion unless the impropriety of counsel's remarks is extreme and is clearly calculated to prejudice the jury. *State v. Taylor*, 289 N.C. 223, 221 S.E. 2d 359 (1976). Nonetheless, N.C.G.S. 8-54 has been interpreted as prohibiting comment on a defendant's failure to testify. *State v. Taylor*, 289 N.C. 223, 221 S.E. 2d 359 (1976).

Having reviewed the arguments of both parties, we hold that the argument of the prosecutor did not improperly refer to the defendant's failure to testify. The prosecutor argued that "there

is no evidence that you heard in this case that is consistent with [the defendant's] innocence." This Court has held that the State properly may bring to the jury's attention a failure to produce exculpatory evidence, since exculpatory evidence need not come solely from a defendant's testimony. *State v. Foust,* 311 N.C. 351, 317 S.E. 2d 385 (1984); *State v. Smith,* 290 N.C. 148, 226 S.E. 2d 10, *cert. denied,* 429 U.S. 932 (1976). The prosecutor's comments in this regard did not go beyond direct rebuttal of the argument made previously by the defense attorney. Any impropriety was invited by the defense attorney's suggestion that one of the factors in the defendant's decision not to present evidence was the importance of the final argument. *See State v. Moose,* 310 N.C. 482, 313 S.E. 2d 507 (1984); *State v. McCall,* 289 N.C. 512, 223 S.E. 2d 303, *vacated in part,* 429 U.S. 912 (1976). We also note that the defense attorneys in their arguments as well as the trial court in its instructions, reminded the jury that the defendant's silence created no presumption against him and should not be considered in any way.

[12]    The defendant also contends that another argument made by the prosecutor was prejudicial error. The defendant's contention centers on the prosecutor's argument that the defendant "didn't have the common decency to leave Alice Cantrell long enough to bury his mother-in-law."

As we have stated, counsel will be allowed wide latitude in the argument of hotly contested cases. *State v. McKenna,* 289 N.C. 668, 224 S.E. 2d 537, *death sentence vacated on other grounds,* 429 U.S. 912 (1976). Counsel for each side may argue to the jury the facts in evidence and all reasonable inferences to be drawn therefrom together with the relevant law so as to present his or her side of the case. *State v. Taylor,* 289 N.C. 223, 221 S.E. 2d 359 (1976). Decisions as to whether an advocate has abused this privilege must be left largely to the sound discretion of the trial court.

The trial court in this instance acted within the bounds of its sound discretion in allowing the contested argument. Alice Cantrell's testimony was that at approximately 10:00 a.m. on the day of the murder, the defendant came to be with her. The two stayed together constantly from that time until the defendant's arrest two days later. The prosecutor's remarks, although touching upon

matters not directly testified to, were reasonable inferences based on the evidence and were within the wide latitude properly afforded counsel in argument. *Id.* The trial court did not err in the manner in which it controlled the arguments of counsel. The defendant's contentions in this regard are without merit.

[13] The defendant next contends that the trial court erred in its final instructions to the jury during the guilt-innocence phase of the trial. The defendant's contention is that the court erred in failing to mention that a sentencing hearing would be held only if there was evidence of an aggravating circumstance. The defendant did not object to the instructions. Where a defendant fails to object to jury instructions prior to the jury's retiring, our review is limited to examining the record for "plain error" or error so fundamental or prejudicial that justice cannot have been done. *State v. Oliver,* 309 N.C. 326, 307 S.E. 2d 304 (1983). Because this is a capital case, however, we have reviewed thoroughly the trial court's instructions. We find no error. As we stated in our discussion of the trial court's remarks to jury veniremen during *voir dire* examination, a sentencing hearing in fact was required and held in the present case. The defendant has failed to show any prejudice caused by the trial court's action in this regard, and his contention is without merit.

[14] The defendant next argues that the trial court committed prejudicial error during the guilt-innocence phase of the trial when it allowed the jury to take photographs which had been admitted into evidence to the jury room over the defendant's objection. After retiring to deliberate in the guilt-innocence phase of the trial, the jury returned and requested "the pictures of the trailers" and a repetition of the definitions of first and second degree murder. The trial court repeated the requested instructions and ordered that the requested photographs be sent to the jury room. The defendant made a timely objection.

Exhibits 6, 8, 9, 10, 14 and 20 were sent to the jury room. Exhibits 6, 8 and 20 were outdoor photographs showing, respectively, the place where a plastic bag containing clothing was found, the trailers inhabited by the defendant and the victim, and the thicket where parts of the metal skillet were found. Exhibits 9, 10 and 14 were photographs which showed, respectively, the overall view of the interior of the victim's trailer and the location of the

body, a metal fragment found on the floor, and the false teeth found near the body.

The defendant cites N.C.G.S. 15A-1233(b) for his argument that the trial court erred in allowing the jury to take the pictures into the jury room over his objection. That statute provides:

> (b) Upon request by the jury *and with consent of all parties*, the judge may in his discretion permit the jury to take to the jury room exhibits and writings which have been received in evidence. If the judge permits the jury to take to the jury room requested exhibits and writings, he may have the jury take additional material or first review other evidence relating to the same issue so as not to give undue prominence to the exhibits or writings taken to the jury room. If the judge permits an exhibit to be taken to the jury room, he must, upon request, instruct the jury not to conduct any experiments with the exhibit.

(Emphasis added.) In *dicta*, this Court in *State v. Barnett*, 307 N.C. 608, 300 S.E. 2d 340 (1983), interpreted the statute to mean that the consent of all parties is required before the jury may take evidence to the jury room. The Court of Appeals has similarly interpreted the statute and held it to be error to allow the jury to take evidence into the jury room over a party's objection. *State v. Taylor*, 56 N.C. App. 113, 287 S.E. 2d 129 (1982); *State v. Prince*, 49 N.C. App. 145, 270 S.E. 2d 521 (1980); *State v. Bell*, 48 N.C. App. 356, 269 S.E. 2d 201, *disc. rev. denied*, 301 N.C. 528, 273 S.E. 2d 455 (1980). We hold that the trial court erred in allowing the jury to take these photographs to the jury room without the consent of all parties. Therefore, our inquiry must turn to whether the error was prejudicial. *Id.*

Under N.C.G.S. 15A-1443(a), a defendant is prejudiced by errors relating to rights arising other than under the Constitution of the United States only when "there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial out of which the appeal arises. The burden of showing such prejudice under this subsection is upon the defendant." We are not persuaded that the defendant has met his burden of showing such prejudice.

The photographs in question had been previously admitted into evidence and shown to the jury to illustrate the testimony of a law enforcement officer. Furthermore, the trial court had the discretion under N.C.G.S. 15A-1232(a) to permit the jury to reexamine the pictures closely and at length in the courtroom. Other evidence introduced during the guilt-innocence phase of the trial linking the murder with the defendant was circumstantial, but compelling. The defendant has not shown a reasonable possibility that had this error not been committed a different result would have been reached. *See State v. Taylor*, 56 N.C. App. 113, 287 S.E. 2d 129 (1982) (no prejudice shown where, over objection, jury while deliberating viewed photographs which had already been admitted into evidence). This contention is without merit.

SENTENCING PHASE

[15] The defendant contends that the trial court erred during the sentencing phase in this case by submitting for the jury's consideration as an aggravating circumstance that the killing was especially heinous, atrocious or cruel. N.C.G.S. 15A-2000(e)(9). It is the defendant's contention that this aggravating circumstance could not be submitted to the jury because the State offered no evidence as to whether the victim was alive or conscious during any substantial portion of the assault. We do not agree.

In *State v. Oliver*, 309 N.C. 326, 307 S.E. 2d 304 (1983), we declined to limit the definition of an especially heinous, atrocious or cruel murder to include only those which involve physical injury or torture prior to death. In *State v. Brown*, 306 N.C. 151, 293 S.E. 2d 569, *cert. denied*, 459 U.S. 1080 (1982), we upheld the submission of this aggravating circumstance even though the evidence did not establish at what point during a brutal attack the victim's death occurred. *See also State v. Johnson*, 298 N.C. 47, 257 S.E. 2d 597 (1979) (aggravating circumstance properly submitted although victim rendered unconscious before she was raped and stabbed to death). We hold that the evidence presented by the State in the present case was sufficient to permit the jury to consider whether the murder of Edna Powell was "especially heinous, atrocious or cruel." Edna Powell died as a result of being battered to death by what can only have been a prolonged series of blows, blows with a cast-iron skillet so severe as to fracture her skull, neck, jaws, and collarbone and to cause her skull to be

pushed into her brain. The severity and the brutality of the numerous wounds inflicted amply justified submission of this aggravating circumstance to the jury.

[16] The defendant next contends that the trial court erred in the sentencing hearing in refusing to permit the defendant's sister to testify to his nonviolent nature. This contention is without merit. Even if it is assumed *arguendo* that it was error to exclude this testimony, the error was harmless beyond all doubt. Both the defendant's mother and his wife testified that the defendant was not violent. His sister's testimony would have been repetitive. More significantly, the jury was convinced by the evidence admitted and found the defendant's nonviolent past to be a mitigating circumstance.

[17] The defendant also contends that the trial court erred by its refusal to charge the jury that it could find as a mitigating circumstance: "That during the sentencing phase, the defendant testified under oath and admitted his role in the victim's death. That this admission of wrongdoing reflects a potential for rehabilitation." In *State v. Pinch*, 306 N.C. 1, 292 S.E. 2d 203 (1982) we held that a defendant demonstrates reversible error in the trial court's omission of timely requested mitigating circumstances only if he establishes three things: (1) that the factor is one the jury could have reasonably deemed to have mitigating value; (2) that there is sufficient evidence of the existence of the factor; and (3) that considering the case as a whole, the exclusion of the factor resulted in ascertainable prejudice. We find no error here.

The defendant maintains that his testimony during the sentencing phase is evidence of a first step toward his rehabilitation. A review of the defendant's testimony and the evidence presented in the sentencing hearing does not support this view. The defendant's testimony, though a confession of guilt, came only after a jury had convicted him of first degree murder and was deciding between a life sentence and the death penalty. Much of his testimony sought to limit his personal responsibility by showing that drugs and alcohol played a part in his killing of his mother-in-law. The defendant indicated during his testimony that he had wanted to keep quiet during the sentencing hearing but that his wife and family wanted him to tell the truth. The evidence was not sufficient to require the submission of the re-

quested mitigating circumstance to the jury. *See State v. Craig*, 308 N.C. 446, 302 S.E. 2d 740, *cert. denied*, --- U.S. ---, 78 L.Ed. 2d 247 (1983) (failure to submit as a mitigating circumstance the defendant's willingness to take a polygraph test was not error since it was self-serving and did not show willingness to cooperate with the police). We hold that the trial court properly refused to submit the requested mitigating circumstance for consideration.

### STATUTORY REVIEW OF SENTENCE BY SUPREME COURT

[18] Having found no prejudicial error by the trial court during either the guilt-innocence or sentencing phases of the trial, we turn to the duties reserved by statute exclusively for this Court in reviewing the judgment and sentence of death. Under N.C.G.S. 15A-2000(d)(2) we must determine whether the record supports a finding of the aggravating circumstance on which the sentencing court based its sentence of death; whether the sentence was imposed under the influence of passion, prejudice or any other arbitrary factor; and whether the sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

We have thoroughly examined the record, transcripts and briefs in this case. As stated previously, we find the record supports the submission of the aggravating circumstance which was considered and found by the jury. Further, we find no indication at all that the death penalty was imposed under the influence of passion, prejudice or arbitrary factors.

We turn then to our final statutory duty of proportionality review. This duty requires us to determine whether the sentence of death in this case is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. For purposes of proportionality review, we use all of the cases in the "pool" of similar cases announced in *State v. Williams*, 308 N.C. 47, 301 S.E. 2d 335, *cert. denied*, --- U.S. ---, 78 L.Ed. 2d 177 (1983).

Having compared the crime and the defendant in this case to those in the pool of similar cases, we do not find the sentence of death entered here to be disproportionate. The evidence presented at trial supports the view that the sixty-five year old female

State v. Huffstetler

victim was brutally beaten to death during a prolonged attack in her own home. The defendant struck the victim with a cast-iron skillet at least fourteen times, breaking her jaws, collarbone and spine and fracturing her skull in several places. The deceased was struck repeatedly with enough force to spatter blood throughout the room in which she was killed. The blows struck were with sufficient force to push a portion of the victim's skull into her brain and expose brain tissue.

No evidence was introduced tending to show that the victim made any threat or assaulted the defendant in any way before he beat her to death with the skillet. The defendant himself testified that he was not angry at the time he beat the victim to death.

After beating the victim, the defendant went to his trailer next door to change his bloody clothes. He put on a pair of gloves before returning to the scene so that he would leave no fingerprints. After disposing of his clothes and the skillet he used as the murder weapon, the defendant left the victim on the floor in a pool of her own blood and went to visit a woman with whom he had previously engaged in shoplifting. He spent the night of the murder in a motel with this woman and stayed with her until his arrest two days later.

Thus, the record before us reveals a senseless, unprovoked, exceptionally brutal, prolonged and murderous assault by an adult male upon a sixty-five year old female in her home. Having compared the defendant and the crime in this case to others in the pool of similar cases, we conclude that the sentence of death entered by the trial court is not disproportionate.

We hold that no prejudicial error was committed in either the guilt-innocence phase or the sentencing phase of the trial and that the sentence of death entered by the trial court was not disproportionate. Further, we hold that this is not a proper case in which to exercise our statutory authority to set aside the sentence of death. We leave the sentence of death undisturbed.

No error.

Justice MARTIN concurring.

Except as herein set out, I concur in the well reasoned majority opinion and in the result reached. With respect to the ruling of the trial judge allowing the jury to take certain exhibits to the jury room, counsel did not brief or argue the constitutionality of N.C.G.S. 15A-1233(b). However, upon considering that issue, I find the statute constitutionally suspect as a violation of the doctrine of separation of powers. N.C. Const. art. I, § 6 and art. IV, § 1. The legislature cannot control the actions of the courts over what exhibits, properly admitted, can be carried by the jury into its jury room during its deliberations. Such action by the legislature is an unconstitutional intrusion and interference with the internal workings of the trial of a jury case. What evidence should or should not be taken to the jury room is a matter peculiarly within the knowledge and discretion of the trial judge on a case by case basis. The trial judge's duty to seek after justice should not be hampered by requirements that evidence cannot be taken into the jury room except by consent of all counsel. It is the duty and responsibility of the trial judge to supervise and control a trial in order that injustice to any party may be prevented. *State v. Spaulding*, 288 N.C. 397, 219 S.E. 2d 178 (1975), *vacated on other grounds*, 428 U.S. 904, 49 L.Ed. 2d 1210 (1976). To this end the court has broad discretionary powers.

I repeat my views concerning the extension of the plain error doctrine to evidentiary matters. *State v. Black*, 308 N.C. 736, 303 S.E. 2d 804 (1983) (Martin, J., concurring).

Justice EXUM dissenting as to sentence.

Believing there is reversible error in the trial court's failure to submit a requested mitigating circumstance and that the death penalty is disproportionate, I respectfully dissent from so much of the majority opinion which concludes to the contrary.

I.

Defendant testified during the sentencing hearing that he had known Mrs. Powell, his mother-in-law and the victim, "way before my marriage, probably about all my life." He said, "Me and my mother-in-law had a good relationship." At this point in the testimony defendant lost his composure and was excused "for a

few minutes to regain" it. Defendant told of his life of drug and alcohol abuse, saying, "Most of my life I've been on and off drugs. This time I've been back on them about two years." On the night before the murder defendant had injected into his veins two dilaudid tablets and drunk a bottle of whiskey. On the morning of the murder he had injected two more dilaudid tablets. He then went to his mother-in-law's trailer, was admitted by her, and sat down on the couch. The two conversed cordially until defendant asked Mrs. Powell if she knew where his wife was. Mrs. Powell replied that she didn't. Defendant testified, "So I got up to leave, and I stood up, and she said, 'David, you've been drinking. You ought to go on up there to jail.'" David replied that he "had to drink around here to find out where [his] wife is cause nobody won't tell you nothing," whereupon Mrs. Powell said, "David, you're just a darn liar. I don't know where she's at. All I know is you called me and said all hell was going to break loose if somebody didn't come and pick you up." Defendant testified, "I said, 'I know I didn't say no such thing.' She said, 'I know you did.' We was just arguing, and I grabbed the frying pan and started hitting her."

Defendant's wife, daughter of the victim, testified that defendant and her mother "got along real well. They only argued over me. That wasn't that much because I always insisted mother let me live my own life, and what David did was between me and him." The witness said, "David's not mean and he's not vicious. He's got a drug habit that he couldn't control, but he was not mean." She said David had sought professional help for his habit a number of times but that the help had been unsuccessful. The witness said that after defendant's arrest and while he was in jail, he told her about the murder. The following colloquy ensued:

Q. Do you recall when he told you what happened?

A. It has been since he's been in jail, and it has just been in bits and pieces, virtually what he has said today, but a two-minute conversation, there can't be much said.

Q. Did you have to force David or talk David into telling you the truth about what happened?

A. No, I did not.

Q. How did it come about?

A. He just called me one day, and I answered the phone and he started crying and saying he was sorry, and then after that, when he would call, if I answered the phone, we talked whatever length of time he had.

II.

Defendant requested in writing at the sentencing hearing that the trial court submit, among others which were submitted, the following mitigating circumstance:

That during the sentencing phase, the defendant testified under oath and admitted his role in the victim's death. That this admission of wrongdoing reflects a potential for rehabilitation.

The trial court refused to submit the circumstance. I am satisfied this was error entitling defendant to a new sentencing hearing.

Not to permit a jury to consider any relevant mitigating circumstance is an error of constitutional dimension. *Eddings v. Oklahoma*, 455 U.S. 104 (1982); *Lockett v. Ohio*, 438 U.S. 586 (1978). In *Eddings* the United States Supreme Court reversed a sentence of death and remanded for further sentencing proceedings because the sentencing judge "would not consider in mitigation the circumstances of Eddings' unhappy upbringing and emotional disturbance. . . ." 455 U.S. at 109. This Court recognized as much in *State v. Pinch*, 306 N.C. 1, 27, 292 S.E. 2d 203, 223 (1982), where we held that an error in failing to submit a mitigating circumstance is reversible unless the failure to submit it is "*harmless beyond a reasonable* doubt. G.S. 15A-1443(b)." (Emphasis original.) This is the statutory standard for reversible errors of constitutional dimension. *Compare* sections (a) and (b) of N.C.G.S. 15A-1443. A defendant is entitled to have a mitigating circumstance not listed in the statute, N.C.G.S. 15A-2000(f), if he makes a timely written request for it, if it is supported by the evidence, and if the jury could reasonably deem it to have mitigating value. *State v. Johnson*, 298 N.C. 47, 72-74, 257 S.E. 2d 597, 616-17 (1979); *accord, State v. Pinch*, 306 N.C. at 26-27, 292 S.E. 2d at 223.

Defendant here exercised his Fifth Amendment right not to testify in the guilt phase. At the sentencing phase, however, he did testify and admitted his guilt to the jury. So far as the transcript of his testimony, both on direct and cross, reveals, it was straightforward, unequivocal, and truthful. A jury could reasonably find that defendant's admission of his guilt was a first step toward recognition of his wrongdoing and his ultimate potential rehabilitation. It was, therefore, error of constitutional dimension for the trial court not to submit this mitigating circumstance.

Whether this murder was premeditated and deliberated is a close question, although I agree with the majority that there is enough evidence in the guilt phase to carry the question to the jury. Further, even if one concludes, as does the majority, that a sentence of death is not disproportionate, a conclusion with which I disagree, this is not a compelling case for the death penalty. Therefore I cannot say that failure to submit the tendered mitigating circumstance was harmless beyond a reasonable doubt.

The majority says that because defendant admitted his guilt only after he had been convicted by a jury, told the jury that he was under the influence of drugs and alcohol when he committed the murder, and had indicated to his family that he did not want to testify, the fact that he ultimately did testify and admit his guilt cannot as a matter of law be considered a mitigating circumstance.

I disagree. Defendant was exercising his Fifth Amendment right not to be a witness against himself during the guilt phase. He should not be penalized for the exercise of this right when at the penalty phase he decides to forego the right and admit his guilt. There was plenary corroborative evidence of defendant's addiction to drugs and alcohol other than defendant's own testimony. This formed the basis of the mitigating circumstance that defendant's capacity to appreciate the criminality of his conduct was impaired. That defendant so testified is no reason to say that his admission of guilt cannot be considered as a mitigating circumstance. Finally, defendant's admission that he had not at first wanted to testify is no reason to hold as a matter of law that his ultimate decision "to tell the truth" cannot be considered by the jury as a mitigating circumstance.

The question is not whether this Court thinks defendant's admission is or is not a mitigating circumstance. The question is whether a jury could reasonably find it to be one. The factors mentioned in the majority opinion at most might be urged upon a jury in an effort to persuade it not to find defendant's testimony to be mitigating. They do not render the testimony non-mitigating as a matter of law.

## III.

I conclude that the death sentence is excessive and disproportionate "to the penalty imposed in similar cases, considering both the crime and the defendant." N.C.G.S. 15A-2000(d)(2).

The majority deals with this aspect of the case perfunctorily. It refers to the "pool" of similar cases and says that it has compared the defendant and the crime to these cases without saying which of the cases in the pool it finds similar or to which cases it has compared the instant case. The majority simply describes the crime, without describing the defendant, and concludes that the sentence of death is not disproportionate. The majority seems to treat the issue as being one exclusively within this Court's unbridled discretion.

I think the question of proportionality of any death sentence is more serious than this. It is not a question for the unbridled discretion of this Court. We do not sit as a super jury on this issue. Whether a death sentence in any case is disproportionate is a question of law. In *State v. Jackson*, 309 N.C. 26, 46, 305 S.E. 2d 703, 717 (1983), the Court declared the death penalty imposed in that case disproportionate "as a matter of law." In *Jackson* and *State v. Hill*, 311 N.C. 465, 319 S.E. 2d 163 (1984), this Court took pains to note that our responsibility in conducting a proportionality review was serious indeed. Justice Martin, writing for the Court in *Jackson*, said, 309 N.C. at 46, 305 S.E. 2d at 717:

> The purpose of proportionality review is to serve as a check against the capricious or random imposition of the death penalty. *State v. Hutchins*, 303 N.C. 321, 279 S.E. 2d 788 (1981). We repeat that we consider the responsibility placed upon us by N.C.G.S. 15A-2000(d)(2) to be as serious as any responsibility placed upon an appellate court. *State v. Rook*, 304 N.C. 201, 283 S.E. 2d 732 (1981), *cert. denied*, 455

U.S. 1038 (1982). In carrying out our duties under the statute, we must be sensitive not only to the mandate of our legislature but also to the constitutional dimensions of our review. *Id.* We have, therefore, carefully reviewed the record, briefs, and oral arguments presented.

The foregoing was quoted with approval in *Hill*, 311 N.C. at 476, 319 S.E. 2d at 170, where the Court, in an opinion by Chief Justice Branch, said, "We have recognized, and continue to recognize the gravity of the duty imposed upon us by statute."

In both *Hill* and *State v. Lawson*, 310 N.C. 632, 314 S.E. 2d 493 (1984), the Court was careful to select similar cases with regard to the nature of the defendant and the nature of the crime from the available "pool" of cases for comparison purposes in conducting its proportionality review. *Hill* involved the murder of a policeman. The Court concluded the death penalty was disproportionate. The Court compared the case first to other cases involving the killing of law enforcement officers and second to other cases in which the death penalty had been affirmed on appeal for the purpose of demonstrating that the murder in *Hill* was not as egregious as in those other cases. It also emphasized the defendant's lack of past criminal activity, his being gainfully employed and his cooperation during the investigation. In *Lawson* the Court said:

In essence, our task on proportionality review is to compare the case at bar with other cases in the pool which are roughly similar with regard to the crime and the defendant, such as, for example, the manner in which the crime was committed and defendant's character, background, and physical and mental condition. If, after making such a comparison, we find that juries have consistently been returning death sentences in the similar cases, then we will have a strong basis for concluding that a death sentence in the case under review is not excessive or disproportionate. On the other hand if we find that juries have consistently been returning life sentences in the similar cases, we will have a strong basis for concluding that a death sentence in the case under review is excessive or disproportionate.

310 N.C. at 648, 314 S.E. 2d at 503.

State v. Huffstetler

*Lawson* involved a murder committed during a burglary. In sustaining the death sentence as proportionate, we compared *Lawson* with other cases involving robbery-murders in which life imprisonment had been imposed and distinguished *Lawson* from those cases. We also demonstrated how the circumstances in *Lawson* were similar with regard to both the crime *and* the defendant to circumstances in a number of cases in which the death penalty had been affirmed on appeal.

I think the approach used on proportionality review in *Hill*, *Lawson*, and *Jackson* is the proper one. When it is employed here, the conclusion is inescapable that the death sentence is disproportionate.

Although I concur in the majority's conclusion that the evidence at the guilt phase, considered alone, is enough to be submitted to the jury on the element of premeditation and deliberation, defendant's testimony at the sentencing hearing, if believed, goes a long way toward depriving this crime of that essential element of first degree murder. The jury believed this testimony because they found as a mitigating circumstance that the killing occurred "contemporaneously to an argument between the defendant and the victim, a person whom he knew by virtue of a domestic relationship, and by means of an instrument acquired at the scene and not taken there."

For deliberation, a necessary element of first degree murder, to be present, the specific intent to kill, also a necessary element of the crime, "must arise from 'a fixed determination previously formed after weighing the matter.'" *Hill*, 311 N.C. at 470, 319 S.E. 2d at 167, quoting *State v. Corn*, 303 N.C. 293, 296-97, 278 S.E. 2d 221, 223 (1981). "Deliberation means that the intent to kill was formed while defendant was in a cool state of blood and not under the influence of a violent passion suddenly aroused by sufficient provocation." *State v. Misenheimer*, 304 N.C. 108, 113, 282 S.E. 2d 791, 795 (1981). The provocation necessary to reduce first degree murder to second degree murder is less than the provocation required to reduce second degree murder to manslaughter. *State v. Thomas*, 118 N.C. 1113, 24 S.E. 431 (1896). In *Thomas*, defendant was convicted of the first degree murder of his wife and sentenced to death. There was some evidence that the killing occurred during a verbal argument. This Court on appeal held

that it was error not to submit to the jury the lesser included offense of second degree murder. The Court said:

> There being no actual evidence of a fight between the prisoner and deceased, the jury were left to grope in the dark as to their duty in case they were not satisfied by the State beyond a reasonable doubt that the prisoner acted upon a fixed purpose to kill, distinctly formed in his mind. If [the jury] concluded that there was a quarrel or argument, and in the heat of sudden passion, engendered by disagreeable language, which would not have been provocation sufficient to bring the offense within the definition of manslaughter, the crime . . . was murder in the second degree.

*Id.* at 1124, 24 S.E. at 435. Thus if the intent to kill is suddenly formed in the course of a quarrel with another and is the product of that quarrel, it is not formed in a cool state of blood and there is no deliberation sufficient to support a conviction of first degree murder. *Corn*, 303 N.C. at 297, 278 S.E. 2d at 223; *Misenheimer*, 304 N.C. at 113-14, 282 S.E. 2d at 795; *Thomas*, 118 N.C. at 1125, 24 S.E. at 435.

The jury's conclusion after the sentencing hearing that this killing occurred "contemporaneously to an argument between the defendant and the victim" makes this case, for proportionality review purposes, much like *Hill*, 311 N.C. 465, 319 S.E. 2d 163 (1984), in which a police officer was killed by defendant during a struggle. A majority of the Court concluded that there was sufficient evidence of first degree murder, but it reversed a sentence of death on proportionality grounds principally because the evidence regarding precisely how the murder occurred "admits of some confusion and is certainly speculative at best." *Id.* at 479, 319 S.E. 2d at 172. The Court said in conducting its proportionality review, "[T]here is no evidence that defendant coldly calculated or planned the commission of this crime over a period of time. . . ." *Id.* at 478, 319 S.E. 2d at 171. In concluding its proportionality review, the Court said:

> Given the somewhat speculative nature of the evidence surrounding the murder here, the apparent lack of motive, the apparent absence of any simultaneous offenses, and the incredibly short amount of time involved, together with the

jury's finding of three mitigating circumstances tending to show defendant's lack of past criminal activity and his being gainfully employed, and the unqualified cooperation of defendant during the investigation, we are constrained to hold as a matter of law that the death sentence imposed here is disproportionate within the meaning of G.S. 15A-2000(d)(2).

*Id.* at 479, 319 S.E. 2d at 172.

The jury here found as mitigating circumstances that defendant did not have a history of violent conduct, that his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired, and that the victim in this case was a person whom defendant knew by virtue of a domestic relationship.

In every case so far, affirmed on appeal, where murders have arisen out of prior close or domestic relationships and where there was evidence of impaired capacity arising from drug or alcohol abuse, except for *State v. Noland*, 312 N.C. 1, 320 S.E. 2d 642 (1984), our juries have returned a sentence of life imprisonment. *State v. Anderson*, 303 N.C. 185, 278 S.E. 2d 238 (1981) (defendant killed woman with whom he had previously lived but from whom he was separated at the time of the murder; evidence that defendant suffered from passive-aggressive personality disorder and alcohol and drug abuse); *State v. Clark*, 300 N.C. 116, 265 S.E. 2d 204 (1980) (defendant killed father in a rage; evidence of alcohol and drug abuse); *State v. Franks*, 300 N.C. 1, 265 S.E. 2d 177 (1980) (defendant killed girlfriend; evidence that defendant suffered from alcohol and drug abuse). In *Noland* defendant was convicted of first degree murder of both his sister-in-law and her husband. He was also convicted of first degree burglary of their home, first degree burglary of the home of his parents-in-law and felonious assault upon his mother-in-law. There was no question concerning the element of premeditation and deliberation. There was substantial evidence of defendant's mental and emotional disturbance, but the jury did not indicate whether it believed this evidence. The aggravating circumstance in *Noland* was that the murder "was part of a course of conduct [of defendant] which included the commission by the defendant of other crimes of violence against other person or persons." As we noted in our affirmation of a death sentence on proportionality review in

*State v. Lawson,* 310 N.C. 632, 650-51, 314 S.E. 2d 493, 504-05 (1984), the aggravating factor that defendant engaged in a course of conduct involving violence against others was common to seven out of the fourteen cases then in the pool in which this Court affirmed the death sentence. It was likewise present in *Lawson* and was an important consideration in our affirmation of the death sentence in that case.

In every case so far, affirmed on appeal, where murders have arisen out of prior close or domestic relationships, except *State v. Boyd,* 311 N.C. 408, 319 S.E. 2d 189 (1984), and *State v. Martin,* 303 N.C. 246, 278 S.E. 2d 214, *cert. denied,* 454 U.S. 933, *reh'g denied,* 454 U.S. 1117 (1981), our juries have returned sentences of life imprisonment. *State v. Hinson,* 310 N.C. 245, 311 S.E. 2d 256 (1984) (defendant killed husband); *State v. Woods,* 307 N.C. 213, 297 S.E. 2d 574 (1982) (wife killed husband); *State v. Parton,* 303 N.C. 55, 277 S.E. 2d 410 (1981) (defendant killed girlfriend with whom he had gone fishing); *State v. Colvin,* 297 N.C. 691, 256 S.E. 2d 689 (1979) (defendant killed wife after marital difficulties and after threatening her "before he would allow her to take his children away from him"); *State v. Myers,* 299 N.C. 671, 263 S.E. 2d 768 (1980) (defendant killed estranged wife).

*Boyd* and *Martin* are easily distinguishable from the instant case. In *Boyd,* the victim (defendant's girlfriend) died as a result of thirty-seven stab wounds inflicted by defendant. In addition to the especially heinous aggravating circumstance, the jury found that defendant had previously been convicted of a violent felony. Most importantly, the Court in *Boyd* said at the close of its proportionality review that "scanty evidence of emotional or mental disorder, which together with defendant's significant history of criminal convictions and the heinous nature of the crime, including suffering of the victim, provide the basis for a penalty of death." 311 N.C. at 436, 319 S.E. 2d at 207. In *Martin,* likewise, the murder of defendant's estanged wife was particularly brutal. Defendant shot her twice, disabling her. He then dragged her across the room while she was still alive, held her up with one hand while he struck her four or five times with the pistol, threw her against the wall and hit her several times with the pistol while she begged him not to hit her any more. Then in the presence of her small child and with the victim pleading for her life and asking for forgiveness, defendant fired three more shots, two

of which, entering her head, were fatal. The jury in *Boyd* expressly found that defendant was *not* under the influence of a mental or emotional disturbance and that his capacity to appreciate the criminality of his conduct was *not* impaired.

In summary, this case, because of the closeness of the deliberation issue and the absence of any prior violent conduct of defendant, is quite similar to *Hill* in which we set aside the death penalty as disproportionate. It is much like all the other cases where the killing arose out of a close or domestic relationship and was the product, in part, of drug and alcohol abuse, in which our juries have consistently imposed life imprisonment. The death sentence here, therefore, is disproportionate.

For the reasons given I vote for a new sentencing hearing and, failing that, I vote to remand the case for entry of a sentence of life imprisonment.

Justice FRYE joins in this dissenting opinion.